JAMES B. WHITE *et al.*

*v.*

ALEXANDER ROSS *et al.*

*Filed at Ottawa October 11, 1895—Rehearing denied March 13, 1896.*

1. TRUSTS—*express trust can only be shown by writing.* An express trust in favor of a grantor in a deed absolute on its face cannot be established unless shown by some writing signed by the grantee.

2. SAME—*sufficiency of answer in chancery to show trust.* An answer to a bill in chancery does not establish a trust, although some parts of it, standing alone, might tend to show a trust, when the whole answer, as it stands, does not prove it.

3. SAME—*what is not a sufficient declaration of trust.* The statement of a grantee in conveyances from her children, that she took the title through fear they might be robbed of their inheritance on account of their inexperience, is not sufficient to establish a trust.

4. SAME—*under what circumstances equity will raise a constructive trust.* When a conveyance constructively fraudulent is obtained by a mother from her daughter by means of improper influence, equity will fasten a constructive trust upon the conscience of the mother and those claiming under her as holders of the legal title, making them trustees for such daughter or for one claiming under her.

5. EVIDENCE—*parent taking conveyance from child—burden of proof.* The burden of showing that a daughter acted independently, advisedly, and of her own free, intelligent will and accord, in conveying to her mother, who was already wealthy, a large amount of property, embracing the daughter's entire estate and only means of support, while she was an invalid and wholly unable to earn her own living, rests upon the mother and those claiming under her.

6. SAME—*reasonable gift by daughter to mother not presumed fraudulent.* A gift by a daughter to her mother of an interest in paintings, which is a reasonable and proper one, will not be defeated by presumption of improper influence.

APPEAL from the Circuit Court of Cook county; the Hon. SAMUEL P. McCONNELL, Judge, presiding.

IRA W. BUELL, for appellants:

To establish the trust it must at least be shown affirmatively that fraud, artifice, solicitation or persuasion was used in procuring the execution of the deeds. Perry on

Trusts, (4th ed.) secs. 76, 77, 162; *Dyer* v. *Dyer*, 1 White & Tudor's Lead. Cas. 354 ; *Stevenson* v. *Crapnell*, 114 Ill. 19 ; *Francis* v. *Roades*, 146 id. 635; *Champlin* v. *Champlin*, 136 id. 309; *Lantry* v. *Lantry*, 51 id. 458; *Scott* v. *Harris*, 113 id. 447; *Reed* v. *Reed*, 135 id. 482; *Walter* v. *Lock*, 5 Cush. 90; *Blodgett* v. *Hildreth*, 103 Mass. 350 ; *Francis* v. *Wilkinson*, 147 Ill. 370; *Donlin* v. *Bradley*, 119 id. 412 ; *Biggins* v. *Biggins*, 133 id. 211.

A deed from a child to its parent, made a long time after it has attained its majority, is valid, unless it shall be shown by affirmative proof that such deed was obtained by improper and undue influence exercised by the parent. *Jenkins* v. *Pye*, 12 Pet. 240; 1 Beach on Modern Eq. Jur. sec. 120; Perry on Trusts, (4th ed.) sec. 201, and cases cited.

SIDNEY SMITH, also for appellants :

It is claimed by counsel for Ross that the relationship of parent and child alone, without any affirmative proof of fraud or undue influence, renders these instruments *prima facie* void.  Such is not the rule applicable to this case.  1 Blackstone, chaps. 16, 17 ; 2 Kent's Com. 234 ; Story's Eq. Jur. sec. 317; *Carter* v. *Tice*, 120 Ill. 277; *Jenkins* v. *Pye*, 12 Pet. 241; Hill on Trustees, 157; Newland on Contracts, 445.

Repeated attempts have been made in this State to raise or establish, by parol testimony, an express trust upon what are termed voluntary deeds, on the ground of want of money consideration, but such attempts have uniformly failed.  Such was the case in *Lantry* v. *Lantry*, 51 Ill. 438; *Scott* v. *Harris*, 113 id. 447; *Stevenson* v. *Crapnell*, 114 id. 19; *Champlin* v. *Champlin*, 136 id. 309.

In this case there can be no pretense of a resulting trust, the nature and requisites of which are well understood, and have nowhere been more fully defined and explained than by this court.  *Stevenson* v. *Thompson*, 13 Ill. 186; *Perry* v. *McHenry*, id. 227; *Case* v. *Woodruff*, id. 654; *Bruce* v. *Roney*, 18 id. 67.

What is sometimes termed an implied or constructive trust must have, as an essential ingredient, fraud perpetrated by a grantee who is clothed with some fiduciary character, or who in some way is chargeable with a breach of confidence, if he sets up or claims the deed as absolute. *Biggins* v. *Biggins,* 133 Ill. 211; *Lantry* v. *Lantry,* 51 id. 438; *Reed* v. *Reed,* 135 id. 482.

THOMAS DENT, (of counsel,) also for appellants.

WILLIAM R. PLUM, and WILLIAM P. BLACK, for appellees:

When one obtains, by voluntary donation, a large pecuniary benefit in a case where there subsists a relation of confidence between the parties to the gift, the *onus* of proving it a righteous transaction is on the person taking the benefit. *Hoghton* v. *Hoghton,* 15 Beav. 278; *Harvey* v. *Mount,* 8 id. 439; *Cooke* v. *LaMotte,* 15 id. 234; *Coutts* v. *Ackworth,* 8 L. R. Eq. Cas. 558; *Turner* v. *Collins,* L. R. 7 Ch. App. 329; *Ward* v. *Armstrong,* 84 Ill. 151; *Burry* v. *Oppenheim,* 26 Beav. 594; *Ashton* v. *Thompson,* 32 Minn. 25.

If a confidential relation subsists, the *onus* is on the grantee under a donation to show, not only that the grantor acted with deliberate intention, upon fullest knowledge, but also to show how the intention was properly produced. *Hoghton* v. *Hoghton,* 15 Beav. 278; *Turner* v. *Collins,* L. R. 7 Ch. App. 329; *Huguenin* v. *Baseley,* 14 Ves. Jr. 273; *Miskey's Appeal,* 107 Pa. St. 611; *Carter* v. *Tice,* 120 Ill. 277; *Ashton* v. *Thompson,* 32 Minn. 25; *Welles* v. *Middleton,* 1 Cox, 112.

The grantor must, in such case, be advised of all the facts touching the transaction and connected with his estate. *Jones* v. *Lloyd,* 117 Ill. 607.

In cases of this character courts of equity act upon a motive of public policy, for the protection of mankind. Story's Eq. Jur. sec. 307; *Highberger* v. *Stiffler,* 21 Md. 338; *Taylor* v. *Taylor,* 8 How. 184; *Dennis* v. *McCagg,* 32 Ill. 444;

*Stewart* v. *Duffy,* 116 id. 47; *Davis* v. *Hamlin,* 108 id. 47; *Ashton* v. *Thompson,* 32 Minn. 25; *Welles* v. *Middleton,* 1 Cox, 112.

One essential to a valid gift by Annie of her entire estate to her mother is, that the grantor must have had independent advice,—*i. e.,* advice given by one whose only motive was the guarding of her interests. *Taylor* v. *Obee,* 3 Price, 83; *Miskey's Appeal,* 107 Pa. St. 631; *Huguenin* v. *Baseley,* 14 Ves. 273; *Williams* v. *Williams,* 63 Md. 371; *Harvey* v. *Mount,* 8 Beav. 439; *Ashton* v. *Thompson,* 32 Minn. 25.

Incompetency is properly to be inferred from irrational gifts or bargains, and constant reliance on others to manage her affairs. *Million* v. *Taylor,* 38 Ark. 428; *Kempson* v. *Ashbee,* 10 L. R. Ch. App. Cas. 15; *Brooks* v. *Berry,* 2 Gill, 83.

Constructive fraud arises out of confidential relations and advantage taken. *Miskey's Appeal,* 107 Pa. St. 611; *Beach* v. *Dyer,* 93 Ill. 298; *Allen* v. *Jackson,* 122 id. 571; *Stewart* v. *Duffy,* 116 id. 47.

Fraud in the inception may be inferred from subsequent acts and conduct of parties benefited. *Frazier* v. *Miller,* 16 Ill. 51; *Oard* v. *Oard,* 59 id. 47; *Jones* v. *Neely,* 72 id. 451.

If the transactions are so unconscionable as to demonstrate gross imposition or undue influence, courts will set the deeds aside on the ground of fraud. Story's Eq. Jur. secs. 244-246; Jeremy's Eq. Jur. 433; Hill on Trustees, 152; *Moore* v. *Moore,* 56 Cal. 89.

The circumstances of this case are such that the grantor ought not to have been permitted to execute the deed or deeds to her mother. *Coutts* v. *Ackworth,* 8 L. R. Eq. Cas. 558; *Allore* v. *Jewell,* 94 U. S. 506; *Roby* v. *Colehour,* 135 Ill. 300; *Harding* v. *Wheaton,* 2 Mason, 378; *Burry* v. *Oppenheim,* 26 Beav. 594.

If there appears the slightest trace or least scintilla of undue influence or unfair advantage, redress will be given. *Miskey's Appeal,* 107 Pa. St. 611; *Jones* v. *Thompson,* 5 Del. Ch. 374; *Jones* v. *Lloyd,* 117 Ill. 608.

If the consideration is grossly inadequate the deed will be set aside, especially if there are other facts tending to its impeachment. *Jones* v. *Thompson*, 5 Del. Ch. 374; *Allore* v. *Jewell*, 94 U. S. 506.

The wealth of the grantee is considered in determining whether there was a reasonable motive for the grant. *Miskey's Appeal*, 107 Pa. St. 611.

In cases of gift between parent and child the court infers, if the parent has acquired a benefit, the probability of undue influence. Story's Eq. Jur. sec. 309; Pomeroy's Eq. Jur. sec. 962, note; *Hoghton* v. *Hoghton*, 15 Beav. 278; *Taylor* v. *Taylor*, 8 How. 184; *Ward* v. *Armstrong*, 84 Ill. 151; *Oliphant* v. *Leversidge*, 142 id. 160; *Highberger* v. *Stiffler*, 21 Md. 338; *Ashton* v. *Thompson*, 32 Minn. 25; *Conant* v. *Jackson*, 21 Vt. 335.

The want of a power of revocation in a deed of gift, particularly of the donor's entire estate, is an important circumstance tending to show undue influence. *Patterson* v. *Johnson*, 113 Ill. 559; *Finucan* v. *Kendig*, 109 id. 198.

Deeds executed under the influence of unreasonable fears, without adequate consideration, especially to one in whom confidence is reposed, will be set aside. *Highberger* v. *Stiffler*, 21 Md. 338; *Williams* v. *Williams*, 63 id. 371; *Whalen* v. *Whalen*, 3 Cow. 537.

It has been held that even an innocent grantee cannot retain a title obtained by undue influence or by fraud. *Williams* v. *Williams*, 63 Md. 371; *Whalen* v. *Whalen*, 3 Cow. 577; *Cooke* v. *LaMotte*, 15 Beav. 250; *Huguenin* v. *Baseley*, 14 Ves. Jr. 287.

There can be no ratification without the essential elements of a valid original deed, and there must be a clear understanding of the defects to be confirmed and how the courts would treat them. *Greenfield's Estate*, 14 Pa. St. 507; *Morse* v. *Royal*, 12 Ves. 373; *Adams* v. *Brimmer*, 74 N.Y. 539; Perry on Trusts, sec. 851; *Crow* v. *Ballard*, 3 Bro. C. C. 117; *Moxon* v. *Payne*, L. R. 8 Ch. 881; *Dunbar* v. *Tredennick*, 2 Ball & B. 304; *Kempson* v. *Ashbee*, L. R. 10 Ch. 15; *Wood* v.

*Downes,* 18 Ves. 122; *Cocking* v. *Pratt,* 1 id. 401; *Mitchell* v. *Homfray,* 8 Q. B. Div. 587; *Roche* v. *O'Brien,* 1 Ball & B. 330; Kerr on Fraud and Mistake, (2d ed.) 332, *et seq.; Railway Co.* v. *Kelly,* 77 Ill. 426; *Roby* v. *Colehour,* 135 id. 300; *Glenn* v. *Garth,* 133 N. Y. 18.

The answer of Ann White and appellants, signed by all, and also the last answer of appellants after Ann's death, signed by them, are, in legal effect, declarations of trust.    *Jones* v. *Lloyd,* 117 Ill. 597; *McNeil* v. *Welch,* 26 Ill. App. 482; *Rogers* v. *Scroggin,* 19 id. 163 ; *Robbins* v. *Butler,* 24 Ill. 387; *Dennis* v. *McCagg,* 32 id. 429.

The Statute of Frauds has no application in cases like this.    Story's Eq. Jur. sec. 188; *Allen* v. *Jackson,* 122 Ill. 571; Sugden on Vendors, (6th Am. ed.) p. 317, note 2, sec. 911 ; *Roby* v. *Colehour,* 135 Ill. 301; *Henschel* v. *Mamero,* 120 id. 666; *Frazier* v. *Miller,* 16 id. 48; *Wright* v. *Gay,* 101 id. 241; *Dennis* v. *McCagg,* 32 id. 429; *Morgan* v. *Clayton,* 61 id. 35; *Strong* v. *Shea,* 83 id. 575; *Switzer* v. *Skiles,* 5 Gilm. 529; Reed on Statute of Frauds, secs. 971, 852-983; *Collins* v. *Smith,* 18 Ill. 162 ; *Enos* v. *Hunter,* 4 Gilm. 211 ; *Hovey* v. *Holcomb,* 11 Ill. 660; *Coates* v. *Woodworth,* 13 id. 654; *Kane County* v. *Herrington,* 50 id. 232; *Wood* v. *Rabe,* 96 N. Y. 414; *Juson* v. *Tolman,* 9 Ala. 685; *Beach* v. *Dyer,* 93 Ill. 298; *Stewart* v. *Duffy,* 116 id. 47; *Kisler* v. *Kisler,* 2 Watts, 324; Perry on Trusts, secs. 82, 166; Wood on Statute of Frauds, secs. 471, 849; *Kingsbury* v. *Burnside,* 58 Ill. 310; *Smith* v. *Howell,* 3 Stockt. 349; *Johnson* v. *Delaney,* 35 Tex. 42; *Ambrose* v. *Ambrose,* 1 P. Wms. 321; *Crap* v. *Norton,* 9 Mod. 233; *Wright* v. *Gay,* 101 Ill. 233; *Brophy* v. *Lawler,* 107 id. 284; *Johnson* v. *Delaney,* 35 Tex. 42; *Bragg* v. *Paulk,* 42 Me. 502; *Phillips* v. *Park Comrs.* 119 Ill. 640; Perry on Trusts, secs. 81, 511*a,* 249, 254, 508; *Bryan* v. *Howland,* 98 Ill. 625 ; *Doyle* v. *Murphy,* 22 id. 508; *Gruhn* v. *Richardson,* 128 id. 178; *Steele* v. *Clark,* 77 id. 471.

JOHN W. SHOWALTER, also for appellees.

WALLACE HECKMAN, and JAMES G. ELSDON, for appellee Eugene S. Pike.

Mr. JUSTICE CARTER delivered the opinion of the court:

The original bill in this case was filed by Annie C. White, since deceased, against her mother, Ann White, also since deceased, and her brothers, Alexander and James B. White, and her sisters, Elsie and Mary S. White, and others, to set aside certain conveyances of real and personal property derived from her father's estate, and to ascertain and declare her interests therein, and for an accounting. The case has been twice tried in the circuit court of Cook county, but by different chancellors, and upon each trial a decree was rendered for the complainant, setting aside said conveyances, excepting, however, by the terms of the last decree, as to certain paintings of considerable value which were held to have been a reasonable gift from the daughter to her mother. The first decree was reversed by this court for the refusal of the trial court to permit Alexander White, one of the defendants, to testify on behalf of his co-defendants. The opinion of this court rendered on that appeal is reported in 147 Ill. 427. The substance of the pleadings and the principal facts are stated in that opinion, and need not now be repeated. On the second hearing Alexander White was permitted to testify, but substantially the same conclusion was reached by the trial court as on the first hearing.

Very soon after filing her bill, Annie C. White, who had for several years been domiciled in New York City, married Alexander Ross, who, on her death in that city, in January, 1891, by virtue of her last will succeeded to all her property rights as her sole devisee and legatee, and as such devisee and legatee, and as executor of her will, he afterward became the sole party complainant in this cause. Ann White, the mother, died in April, 1890, leaving by her last will all her property, embracing that conveyed to her by her children, which included the share of her daughter Annie now in controversy, to three of her children, James, Elsie and Mary.

The allegations of the bill respecting the execution, acknowledgment and delivery of the several deeds transferring the property to the mother, Ann White, and the reasons and consideration therefor, are sufficiently stated in the former opinion. The evidence is somewhat voluminous, and will not be here stated in detail. We have carefully examined and considered it, and are of the opinion that it fully justifies the conclusion reached by the learned chancellor of the circuit court as to the main facts, and which, for the purposes of this decision, so far as not already stated, may be briefly summarized as follows:

Both before and after the death of Alexander White, Sr., his family, though having their home in or near Chicago, spent a considerable portion of their time in the city of New York, where the children were educated. Annie C. was the youngest daughter, and became eighteen years of age June 12, 1873, and was therefore past twenty-eight years of age when she executed the first deed to her mother, July 14, 1883, and upwards of thirty-two when she made the second deed, in January, 1888, alleged to have been made to take the place of the deed of 1883, which was lost or destroyed. The daughter Annie, although an invalid and somewhat of a pet in the family, took up her abode in New York in the fall of 1884 and never thereafter returned to Chicago. A visit which she proposed to make in 1887 was advised against by her family. She had returned to Chicago, after a temporary absence, shortly before executing the deed to her mother of date July 14, 1883. The deed of January 18, 1888, was prepared in Chicago and sent to her in New York to be executed. The management of her interest in her father's estate had been wholly committed to other members of the family, and she had very little knowledge of what was being done with it or of its extent or value. For convenience in management, leasing, subdivision and sale, she had conveyed certain parcels of real estate to

her brother James, and certain other parcels to her sister
Elsie, who afterward included the same property, or what
remained undisposed of, in their conveyances to their
mother. No account was rendered to her, but she received
regular remittances from some member of the family in
Chicago up to the time of her marriage, sufficient, at least
until a year or two before her marriage, to provide for
her comfortable maintenance suited to her condition in
life. Generally the letters to Annie were written by her
sister Elsie, who wrote with apparent authority from her
mother and the rest of the family. The family had
broken up housekeeping before she took up her home in
New York, and lived at one of the hotels in Chicago when
not sojourning in Europe or elsewhere. After her estab-
lishment in New York a new and expensive residence
was purchased and fitted up in Chicago, and was occupied
by the family for several years without her knowledge,
she being kept in ignorance of the new home established
by her mother, brothers and sisters, and in the belief that
they were still living at the hotel. The explanation
given for thus apparently excluding her from the family
circle, and from all knowledge that they were living in
the quiet of their own home instead of at a public hotel,
was, in part, that it was found unpleasant to keep house
with her because of her interference and inability to get
along with the servants employed in the family. She
had expressed a wish to one Reynolds, a friend of the
family, to accompany him from New York to Chicago on
a visit. He, not feeling at liberty to bring her without
first having obtained the consent of her family, wrote and
mentioned her request. Elsie White, in her testimony,
speaking of the letter from Reynolds and her answer,
says: "It was simply saying that my sister had expressed
a desire to accompany him to Chicago the next time that
he came here, and that he did not care to accept that
responsibility without writing to us, asking whether it
would be agreeable—something of the kind. I replied

to the letter, and remember the substance of the reply.
I said I was obliged to him for the interest he took in the
matter, but that we saw no reason to change the opinion
expressed the last time we saw him here in Chicago at
our home, and we thought at present it would be desira-
ble for my sister to remain in New York; that my brother
Alexander was there, and would see that she had every
attention.    That is all I remember saying.    It was a
short letter.    At the conversation referred to in the
letter with Mr. Reynolds my mother was present.    We
referred to our once having requested Mr. Reynolds not
to say that we were keeping house again.    Either mother
or I—I don't know which—said it, and we would have to
request him again to please not say anything about it for
these reasons.    We simply said that my sister, owing to
her delicate health and being the youngest daughter, had
been spoiled and petted to such an extent that as she
grew older she became very exacting, so that we were
obliged to give up housekeeping two or three times, and
my mother was so unhappy that we felt it our duty at
present to keep our sister away; that we would see that
she would not need for anything, and we thought her
health was better, and under those circumstances we felt
it would be wise and right, and our duty to our mother,
to not have her a member of the family at present.    We
remarked that our sister had a marked preference for
New York, and did not care to live in Chicago.    When
my sister was young, while her father was alive, he and
the family, and all of us, were living in New York a great
deal of the time.    We made our home there.    I think we
lived there about ten years, and my sister and we all
were at school there."    There was evidence, however,
tending to show that the members of the family had lived
happily together, and the letters, mostly from Elsie to
Annie in New York, show great affection for her and
interest in her welfare.    She was addressed by pet names
and in coaxing terms, as might well be expected from an

160—5

older sister writing with affection and authority for her mother as well as herself, to the youngest, who was in poor health, away from her home and wholly dependent upon her family. Many of these letters were in reply to letters written by Annie C. White, but no letters from her were produced. The evidence shows that after the deed of 1888 was made, in reply to the inquiries of Annie C. as to when the estate would be divided, she was informed by her sister Elsie, to whom, with James, the management of the estate had been committed after it had been taken out of the hands of Alexander, that the estate would be settled and divided and she would get her share as soon as the Cotzhausen case should be disposed of. The deed of 1888 was not recorded until after the bill was filed. The deed of 1883 was never recorded, but leases, sales and conveyances were made by the heirs, from time to time, in the same manner as before its execution. No rights were ever asserted under it until the bill in this case was filed, and Annie C. White did not seem to know that she had ever executed such a deed, as no mention was made of it in her original bill, and it was only after it was set up in the answer that it was embraced by amendment in the bill of complaint. This deed of 1883 was not produced at the trial, but witnesses were produced who testified to its execution and its contents. Appellee Ross disputes the fact that any such deed was ever in fact executed, and the notary before whom it was said the acknowledgment was taken, testified that he had no recollection or knowledge of having seen such a deed or taken the acknowledgment of the grantor thereto. But we are of the opinion that the preponderance of the evidence shows that such a deed was in fact made.

The case has been fully and ably argued by counsel on both sides, and many reasons, of more or less force, have been urged as sufficient on the one side to reverse the decree and on the other to sustain it. Appellants strenuously insist that the evidence shows that appellee

Alexander Ross was not entitled to the decree in his favor even if his wife would have been entitled to it had she lived, for the reason that he does not come into court with clean hands. It is insisted that the evidence shows that there was a fraudulent conspiracy between him and the witnesses Reynolds and Stoddard to get possession of Annie C. White and her property by bringing about a marriage between her and Ross, and in procuring the deed and will from her to Ross, and that a court of equity ought not to lend its aid in the acquisition of property to one whose title is tainted with fraud or wrongdoing.

While the principle contended for by appellants is one not to be overlooked, and is one unhesitatingly applied by this court when justified by the evidence, we cannot find sufficient evidence in this record to deny appellee relief on that ground. The evidence does show that the marriage took place the next day after Annie C. White filed the original bill in this case, and that the day following her marriage she made her will in favor of her husband, Ross, as her sole devisee and legatee, and also conveyed to him all the property in question by deed, and that he also made his will in her favor, but there is no evidence whatever that the deed or will was obtained by fraud or undue influence. Appellants contested the will in the courts of New York, but unsuccessfully. The testatrix was held competent, and it was also adjudged that the will was not obtained by fraud or undue influence. While the coincidence between the filing of the bill, the marriage, the making of the deed and will in Ross' favor, the consultations with Reynolds and Stoddard and the preparation of papers by the latter, demands attention, still the evidence fails to show the fraud and conspiracy alleged. It shows that Ross and Reynolds had been friends of the White family for a number of years, and Ross a most intimate personal friend of Alexander White; that Ross had long been devoted in his attentions to Annie C. White, and that they were prob-

ably betrothed as early as 1883,—five years before their marriage. No objection to Ross, or to his marriage with Annie, seems to have been made by any member of the family, though apprehensions seem to have been indulged, generally, that some one might, by marriage, acquire some right or control over some part of the family estate. It surely was no wrong for Annie C. White to assert her right to her interest in her father's estate, if she had any, and it was not fraudulent or wrongful for Ross, as her betrothed, and afterward as her husband, to assist her in recovering title to her property. They had the right to employ counsel and to procure the assistance of friends, and such action would be no evidence of fraud or conspiracy. The deed to Carter, and from him to Ross, was shown to have been in trust for Mrs. Ross. This deed and the mutual wills, following close upon the marriage, would not be sufficient, of themselves, nor in connection with the other evidence, to so taint the title in the hands of Ross with fraud or wrongdoing as to deprive him of his standing in a court of equity.

Nor can we find in the record any sufficient evidence to establish the contention of appellee Ross that the mother, Ann White, was guilty of any fraud in fact, by means of which she procured the deeds in controversy in her favor. It is not shown that she ever requested or advised that the property should be conveyed to her. The scheme seems to have originated with Alexander, James and Elsie, and to have been talked over in the family, mostly by them, sometimes in the presence of the mother and sometimes in the presence of the daughter Annie, but nothing was proved that the latter ever advised or suggested with reference to the matter in any of these family consultations, and the only inference that can be drawn from the evidence is, that she simply acquiesced in whatever was planned by the other members of the family for her to do, and executed whatever papers were prepared and presented to her for execution.

Neither time nor space will permit us to review all the contentions of counsel in the case, but the decree must be sustained, if sustained at all, on one of three grounds or propositions which, in varied forms, have been urged upon the one side and contested on the other, and which may be separately stated and considered, as follows:

First, that there was an express trust in favor of Annie C. White reserved from the conveyances to her mother; that by agreement and understanding of the parties the legal title to all the property was placed in the mother's name as the safest and best course to pursue to preserve it for the benefit of those entitled to it, according to their respective interests, and thus prevent it from passing into the hands of strangers, who, by imposition upon the children, or some of them, might acquire title thereto, and also to meet the expense and requirements of the Cotzhausen litigation. But as to this ground of relief relied on by complainant, the Statute of Frauds having been pleaded by defendants below, it will be seen that an express trust could not be established unless manifested and proved by some writing signed by Ann White. No writing of any kind signed by her was produced having any tendency to establish such a trust, except her answer to the original bill of complaint. It is well settled that an express trust may be declared by an answer in chancery, signed by the party who by law is enabled to declare such trust. (*Robbins* v. *Butler*, 24 Ill. 387; *Jones* v. *Lloyd*, 117 id. 597; *Phillips* v. *South Park Comrs.* 119 id. 626; Perry on Trusts, sec. 81.) But the terms of the trust must be gathered from the whole answer as it stands, and where the answer, taken as a whole, does not prove a trust, no trust can be established by it, although certain parts of the answer, standing alone, tend in some degree to show that a trust was in fact created. Perry on Trusts, sec. 85.

Appellee Ross relies on certain expressions in the answer of Ann White, stating, in substance, that it was

thought the best and safest course to pursue to have the property conveyed to her absolutely, to use and dispose of as she, in her judgment, might deem just and right, and that she was induced to take conveyance to herself, and thus become the absolute owner, through fear that the little knowledge of the ways of men of business and the practical affairs of life possessed by her children would enable some fortune hunter, by false devices or feigned love and marriage, to rob them of their inheritance. This is a mere statement of the motives or some of the reasons for making and accepting the conveyances, and is not sufficient to establish a trust. (*Bryan* v. *Howland*, 98 Ill. 625.) Besides, other parts of the answer allege that the conveyances were intended to, and did, vest in her the absolute title to the property, and state, among other things, that the conveyance by each of his or her interest was in consideration of the conveyances made by the rest, and in consideration of the fact that the mother had helped their father acquire the estate, and that the children thought their father should have given it all, by will, to their mother, and that it was their purpose to do what they thought their father should have done, and vest the whole estate absolutely in their mother. The answer, so far from declaring any trust when taken as a whole, sets up absolute legal and equitable ownership in Ann White. It follows that no express trust was proved.

The second ground or proposition is, that the conveyances were made for convenience, only, and without consideration; that they were voluntary, and that it was not the intention of the parties that the grantee should take beneficially, but that she should hold the legal title, only, and that a resulting trust at once arose in favor of the grantors, which may be established by parol evidence, and which a court of equity will protect and enforce by now compelling the restoration of the legal title. (10 Am. & Eng. Ency. of Law, 4, 56.) As we are satisfied that the decision of this cause must be based on other

grounds, we do not deem it important to follow counsel in their argument on this branch of the case. Much difficulty will be found in deducing such a trust from the facts contained in this record.

The third ground or proposition upon which the decree is sought to be sustained, and the one which we find is sustained by the evidence and supported by abundant authority, may be stated thus: That at, and before and after, the time or times when the deeds in question were made and delivered, the relation of parent and child existed in its full vigor between the mother, Ann White, and the daughter, Annie C. White; that the position of the mother was one of dominance and authority over the daughter, and of the daughter of dependence upon the mother; that the daughter confided in and trusted her mother implicitly; that the mother was already possessed of an abundance of means for her own support,—even of wealth,—and that the property conveyed to the mother by the daughter was of large value, exceeding $200,000, and embraced her entire estate and substantially all her means of support; that the daughter was an invalid, without any business, occupation or profession, wholly unacquainted with business affairs and the forms and instrumentalities by which conveyances of property are made from one person to another, and wholly unable, by reason not only of bad health, but of lack of business education, training and experience, to earn her own living; that nothing was paid or agreed to be paid to the daughter, Annie C. White, for all the vast property so conveyed; that she had no independent advice, and did not understand that she was divesting herself absolutely of all her property rights; that the gift was improvident, and unreasonable on the part of the daughter to make and unconscionable on the part of the mother to accept, and that under such circumstances the presumption of undue influence arises, and that the conveyances in question were obtained by undue influence of the mother over

the daughter, and that the burden of proof is on the mother, and those claiming under her, to show that the daughter acted independently, advisedly and of her own free, intelligent will and accord, uninfluenced by the recipient of so munificent a gift, and no such proof having been made, that, independently of any question of actual fraud, the transaction must be held to be constructively fraudulent, and that a court of equity will raise a constructive trust and fasten it upon the conscience of the holder of the legal title, and convert such holder into a trustee for the party who, in equity, is regarded as the beneficial owner.

The ultimate facts stated in the last proposition are established by the evidence in this case, and are in substantial accordance with the findings of the two chancellors who, on different trials, heard the case below on both oral and written testimony. That such conveyances of property, made under such circumstances, are presumptively voidable there can be no reasonable doubt. This rule in equity is established by the great weight of authority both in England and this country, and is founded on principles of justice and morality. (*Hoghton* v. *Hoghton*, 15 Beav. 278; *Cooke* v. *LaMotte*, id. 234; *Coutts* v. *Ackworth*, 8 L. R. Eq. Cas. 558; *Harvey* v. *Mount*, 8 Beav. 439; *Turner* v. *Collins*, L. R. 7 Ch. App. 329; *Burry* v. *Oppenheim*, 26 Beav. 594; *Ashton* v. *Thompson*, 32 Minn. 25; *Carter* v. *Tice*, 120 Ill. 277; *Highberger* v. *Stiffler*, 21 Md. 338; 83 Am. Dec. 593; *Noble* v. *Moses*, 81 Ala. 530; 60 Am. Rep. 175; 2 Pomeroy's Eq. Jur. sec. 962, note; Schouler on Dom. Relat. sec. 271.) In such cases courts of equity will interfere upon grounds of public policy, or, as often stated, for the preservation of mankind, and unless the donee can show affirmatively that the transaction is "a righteous one" it will be set aside.

It is contended by appellants that such is not the rule in this country, but that the parental authority over the child is only a circumstance to be proved with others tending to establish undue influence; that notwithstand-

ing a conveyance or gift be shown to have been made by the child to the parent at a time, though of full age, when the child was under the dominion of the parent, still the transaction cannot be impeached without some affirmative proof of the exercise of undue influence on the part of the parent, or that the parent was guilty of some fraud, imposition or wrongdoing in obtaining the advantage bestowed; and it is claimed that their contention is supported by the authority of the Supreme Court of the United States in *Jenkins* v. *Pye,* 12 Pet. 24. Counsel quote from the principal opinion in that case, where, in referring to the rule claimed to have been laid down by the English cases, it was said, among other things: "We * * * cannot discover anything to warrant the broad and unqualified doctrine contended for on the part of the appellees. All the cases are accompanied with some ingredient showing undue influence exercised by the parent operating on the fears or hopes of the child, and sufficient to show reasonable ground to presume that the act was not perfectly free and voluntary on the part of the child; and in some cases, although there may be circumstances tending, in some small degree, to show undue influence, yet if the agreement appears reasonable it has been considered enough to outweigh light circumstances, so as not to affect the validity of the deed." "We should not be disposed to adopt or sanction the broad principle contended for, that a deed of a child to a parent is to be deemed *prima facie* void. It is undoubtedly the duty of courts carefully to watch and examine the circumstances attending transactions of this kind, when brought under review before them, to discover if any undue influence has been exercised in obtaining the conveyance. But to consider a parent disqualified to take a voluntary deed from his child without consideration, on account of their relationship, is assuming a principle at war with all filial as well as all parental duty and affection, and acting on the presumption that a parent, instead of wishing to

promote the interest and welfare, would be seeking to overreach and defraud his child." Hill on Trustees, 157, Newland on Contracts, 445, 446, Perry on Trusts, sec. 201, 1 Story's Eq. Jur. sec. 306, and other authorities, are also cited by counsel as denying that conveyances made under such circumstances are *prima facie* invalid.

That the text books and reported decisions are not fully harmonious in their statement of the rule is certainly true. In *Jenkins* v. *Pye*, the father paid a valuable, though perhaps an inadequate, consideration for the property conveyed, and the doctrine of *laches* was also applied as a ground for denying relief. In a separate opinion Mr. Justice CATRON, while concurring in the decision of the case on the ground of *laches*, took issue with the opinion of the court delivered by Mr. Justice THOMP-SON on the other branch of the case. In the subsequent cases of *Taylor* v. *Taylor*, 8 How. 184, and *Allore* v. *Jewell*, 94 U. S. 506, the doctrine as announced by the same court does not materially differ from the general current of authority on the subject, and the question of unreasonableness and unfairness in the transaction is made to cut an important figure. Judge STORY, in his work on Equity Jurisprudence, (vol. 1, sec. 309,) says: "The natural and just influence which a parent has over a child renders it peculiarly important for courts of justice to watch over and protect the interests of the latter, and therefore all contracts and conveyances whereby benefits are secured by children to their parents are objects of jealousy, and if they are not entered into with scrupulous good faith, *and are not reasonable under the circumstances, they will be set aside,* unless third persons have acquired an interest under them." So in Perry on Trusts it is said, that while courts of equity will scrutinize conveyances of property by children to their parents, they are not *prima facie* void, but that there must be some affirmative proof of undue influence or other improper conduct to render the transaction void. But it is also said that "the position and influence

of parent over a child are so controlling that the trans-
action should be carefully examined, and sales by a child
to a parent *must appear to be* fair and reasonable." So,
also, in Hill on Trustees, 157, it is said that "every con-
tract or conveyance whereby benefits are secured to
parents by their children must be perfectly fair and rea-
sonable in all its terms and circumstances, or otherwise
it will be set aside." It is true the author says that
before this will be done it will be necessary to prove the
exercise of undue influence, or to establish some other
case of actual *or constructive fraud* against the parent.
So, too, in the citation from Newland on Contracts, the
author makes the reasonableness of the transaction an
important element. It is there said that equity has re-
fused to interfere because of the mere relation of parent
and child, especially where the agreement was reason-
able, or entered into to effect a laudable purpose. In
*Oliphant* v. *Liversidge,* 142 Ill. 160, this court, in sustaining
a deed of gift from father to child, said (p. 170): "Nor
does any presumption of fraud arise from the fact that
the grantor is the father of the grantees. In the case of
a gift from a child to a parent undue influence may be
inferred from the relation itself, but never where the
gift is from the parent to the child." In *Finucan* v. *Ken-
dig,* 109 Ill. 198, and *Patterson* v. *Johnson,* 113 id. 559, this
court distinctly recognized the question of unreasonable-
ness and improvidence in the transaction as an element
to be considered in determining its binding force upon
the parties. In the latter case such facts and circum-
stances were proved as showed the transaction a reason-
able and proper one, and this court said (p. 572): "The
record shows that there was no influence whatever used
by the father to procure the deed, and that it was made
by the daughters of their own volition. The making of
the deed was a graceful tribute of filial affection."

If a child possessing wealth should, while under par-
ental control, though past minority, make a deed of gift

of property of substantial value to his indigent parent, sufficient to maintain such parent in comfort, and even elegance, the remainder of his life, but reserving sufficient for his own needs, thus eliminating from the transaction all improvidence, all unreasonableness and all apparent unconscientiousness on the part of the parent, it might be justly contended that the rule would be a harsh one that would cast the burden of proof on the parent, or on those claiming under him, to prove that no undue influence was resorted to to obtain the gift. But where, as in this case, the transaction appears to have been an improvident and unreasonable one for the child to enter into, and one apparently involving the taking of an unconscionable advantage by the parent in accepting and retaining the property, there can be no doubt, from the standpoint of any well-considered case, that the burden of proof is cast upon the parent to prove that the transaction was, in the language often used, "a righteous one." We agree, however, with the learned chancellor of the circuit court in holding that the gift by Annie C. White of her interest in the paintings in controversy, to her mother, prior to the making of the deeds, was a reasonable and proper one, and there being no proof of any improper influence, the bill of sale making such gift should stand. Nor are we disposed to disturb the decree as to the leasehold interest of the appellee Pike. We have carefully considered the evidence and argument on this branch of the case and agree with the conclusion reached by the trial court.

Some alleged errors of the trial court in admitting and refusing to admit certain testimony have been insisted upon, but as they are not of controlling importance, and as the offered testimony would not have authorized a different decree, no necessity is seen for extending this opinion in their discussion.

The decree of the circuit court will be affirmed.

*Decree affirmed.*