**OLIPHINT v. WESTERN INDEMNITY CO. et al.**

No. 10398—Opinion Filed Jan. 31, 1922.

Rehearing Denied Feb. 28, 1922.

(Syllabus.)

**1. Guardian and Ward—Parent and Child—Fiduciary Relation After Removal of Father as Guardian.**

Where a father has been duly appointed guardian of his minor daughter and acted as such for several years, and thereafter been removed as such guardian, but the daughter manifests a love and affection for her father and continues to live as a member of his family until seven days after she reaches her majority, there is a fiduciary relationship existing between the father and the daughter.

**2. Deeds—Consideration—Deed to Cover Defalcation of Father.**

Where the father as such guardian has misappropriated the funds belonging to his daughter, and seven days after she becomes of age, while she is still a member of his household and under his influence, she executes a deed intended to be a mortgage to secure the payment of the pre-existing debt of her father incurred by such defalcation, and the grantee in such deed is the surety on her father's guardianship bond and has full knowledge of all the facts, held, that the deed was given by the daughter for the benefit of the father, and, there being no consideration therefor, the fiduciary relationship existing between the father and daughter will avoid the instrument.

**3. Same—Fraud—Duress—Undue Influence.**

Where a guardian, following the misappropriation of funds belonging to his minor daughter, has been arrested on charges of embezzlement, and while such charges are still pending and his daughter is still a minor he agrees with the surety company on his bond that his daughter, whose funds have been misappropriated, will as soon as she becomes of age execute a mortgage on her property to secure to the surety company the repayment of the money it has expended on account of his defalcation, and three or four months after such agreement so made by the father and seven days after the daughter becomes of age she, with knowledge that there has been criminal prosecution pending against her father, and while laboring under a mental fear that her father will be sent to the penitentiary, executes a deed intended to be a mortgage to secure the payment of said indebtedness owing by her father to such surety company, and without any other consideration, such deed is procured by duress, menace, fraud, and undue influence. The surety company cannot take advantage of the fact that the criminal prosecution against the father was dismissed two days before the daughter became of age, when it failed to fully reveal and explain such fact to the daughter before she executed the deed.

**4. Same—Cancellation of Deed.**

The record examined, and held, that the deed executed by the plaintiff in error was intended as a mortgage to secure the payment of the pre-existing debt of her father, and its execution was procured by the surety company by duress, menace, fraud, and undue influence, and that it is therefore void and should be canceled.

Error from District Court, McClain County; F. B. Swank, Judge.

Action by Lucile M. Oliphint against the Western Indemnity Company and others, to cancel a certain quitclaim deed. Judgment in favor of defendant Western Indemnity Company decreeing the deed to be a mortgage to secure the payment of a specified sum and creating a valid and subsisting lien on the land therein described. Plaintiff appeals. Reversed and remanded.

W. R. Wallace, for plaintiff in error.

J. T. Blanton and Williams & Luttrell, for defendants in error.

MILLER, J. This action was commenced in the district court of McClain county by Lucile M. Oliphint, as plaintiff, against the Western Indemnity Company, a corporation, S. R. Oliphint, Sallie M. Hullett, Mrs. S. M. Hullett, and Davidson-Case Lumber Company, a corporation, as defendants, to cancel a certain deed and recover 110 acres of land situated in McClain county, the same being a part of the allotment of Lucile M. Oliphint, who was a member by blood of the Chickasaw Tribe of Indians and enrolled opposite roll No. 1278. A jury was waived and the case was tried to the court. At the conclusion of the trial the court made special findings of fact and conclusions of law and decreed the deed to be a mortgage to secure the payment of $8,228.08, with interest at eight per cent. from January 21, 1916. The plaintiff, Lucile M. Oliphint, perfected this appeal and appears here as plaintiff in error. The defendant Western Indemnity Company, a corporation, is one of the defendants in error and has filed a brief; the other defendants in error have not filed a brief or made any appearance. The plaintiff sets out nine specifications of error in her petition in error, then discusses them under two assignments of error, as follows:

"I. The court erred in overruling the motion of the plaintiff for new trial and in its conclusions of law and in its findings of fact and in the judgment rendered by the court, because the same are contrary to the law and are not supported by the evidence and are against the weight of the evidence.

"II. The finding of the court and the judgment rendered by the court against the plain-

tiff in error are contrary to the law and against the weight of the evidence, and the court erred in not finding in favor of the plaintiff in error and in not rendering judgment in favor of the plaintiff in error and against the defendant in error."

These are the facts, as disclosed by the record: Lucille M. Oliphint is a Chickasaw Indian by blood, and received as a part of her allotment the tract of land in controversy in this action, consisting of 110 acres, situated in McClain county. Her father, S. R. Oliphint, was appointed her guardian by the county court of Garvin county. While acting as such guardian, he made a sale of this tract of land through proceedings instituted for that purpose in the county court of Garvin county. The land was sold to E. G. Hightower, who immediately mortgaged it to the Alliance Trust Company, and paid over to S. R. Oliphint, as guardian, the amount of money he received from the loan, and then reconveyed the land to him. S. R. Oliphint had also been appointed guardian of certain other of his minor children, and the same proceedings were conducted in regard to their lands. He then took the several sums of money thus obtained from the sale of the lands belonging to his minor children and removed with his family to Del Norte, Colo. Without any authority from the county court of Garvin county, he invested this money in real estate and other property. These investments did not prove successful, and all the money was eventually lost.

S. R. Oliphint was removed as guardian, and N. D. Duffield was appointed in his place. Duffield brought an action to recover on the former guardian's bond against the Western Indemnity Company, as bondsman. Thereupon, and in 1913, the Western Indemnity Company caused charges of embezzlement to be filed against S. R. Oliphint, and he was arrested.

While this action and the criminal prosecution were pending, negotiations were had between the attorneys for the Western Indemnity Company and attorneys for N. D. Duffield, as guardian, for a settlement of the case pending against the surety company, as bondsman. In September, 1915, the attorneys for the defendant in error Western Indemnity Company went to the home of S. R. Oliphint in Norman, and there in the presence of Lucile M. Oliphint, S. R. Oliphint, his wife, and some other members of his family, this proposition of settlement was considered and agreed upon:

That the Western Indemnity Company should purchase the several tracts of land

formerly belonging to the Oliphint minors, including the 110 acres of land formerly belonging to Lucile M. Oliphint. It could be purchased from the Alliance Trust Company, mortgagee, which had foreclosed the mortgage on the land and purchased it under the execution sale. The Western Indemnity Company would reconvey these lands to the respective former owners after Lucile M. Oliphint became of age, which would be January 19, 1916. Her father, S. R. Oliphint, agreed that Lucile should thereupon deed her land back to the Western Indemnity Company or give a mortgage on the land to secure the payment of the amount of money expended by the Western Indemnity Company in making good his default as guardian. By this arrangement the lands of three of the younger minor children of S. R. Oliphint were to be reconveyed to them free and unincumbered. The land of Lucile and an older sister was to stand good for the default of their father as guardian. At the time of this meeting Lucile understood there were criminal charges pending against her father, and that he was in danger of being sent to the penitentiary if these charges were prosecuted. The Western Indemnity Company refused to consummate this settlement until Lucile became of age so that she could comply with her part as agreed upon by her father, and to which she probably consented, but she was not bound by any such agreement, for she was not of age in September, 1915.

On January 27, 1916, the attorneys for the Western Indemnity Company again called at the Oliphint home in Norman to consummate the agreement made in September. At this time S. R. Oliphint executed a note for $8,-228.08, being the amount that the Western Indemnity Company had expended on account of his default as guardian. Lucile executed the quitclaim deed which was intended to be a mortgage to secure the payment of this note given by her father. The criminal prosecution against Oliphint was dismissed on January 17, 1916, but this was not disclosed to Lucile.

Concerning the interview had on the 27th day of January, 1916, at the time the plaintiff in error signed the deed which she seeks to cancel by this action, she testified in part as follows:

"Q. Now, just state to the court as well as you can, Miss Lucile, the conversation that occurred here that day. A. Well, we were afraid to talk—we were afraid that papa would be sent to the penitentiary and there was a mortgage on our land and we couldn't possibly get it back unless we signed those papers. Q. Well, now, my question was for

the conversation—I wish you would state in substance, at least, or just what was said by Mr. Taylor and Mr. Andrews and your father, if you remember? A. Well, I don't remember all—all I understood was about the mortgage. Q. Well, What understanding did you get about the mortgage there, and what was said? A. Well, they said there was a mortgage on our land and we couldn't possibly get it back unless we signed these papers, that Judge Wallace or no one else could get it back for us.* * * Q. Now, for what reason did you sign those papers? A. Well, I was afraid that my father would be sent to the penitentiary and to try to get my land back. * * * Q. Did anyone tell you before you signed that deed that the criminal prosecution in the district court of Garvin county against your father had already been dismissed? A. No, sir.''

A. F. Pyeatt, one of the attorneys for N. D. Duffield as guardian of Lucile M. Oliphint, testified in part as follows:

"Q. I call your attention to the provision in the body of the contract which granted to the Western Indemnity Company until January 20, 1916, within which to clear the Lucile Oliphint land of certain claims and liens, do you recall any conversations between yourself and a representative of the Western Indemnity Company as to why they wanted that length of time? A. I cannot attempt to repeat the conversation verbatim but there was a conversation or conversations between myself and Mr. Andrews and possibly Mr. Andrews and Mr. Lasater which was conveyed to me as to the reason why they wanted it deferred until about the first of February, 1916, which was about the birthday of Lucile Oliphint. I see here in my writing that the date was changed from the first of February, to January 20th, as I recall so that there would still be time at the January term of court to try the case if the conditions of settlement were not complied with. Q. But substantially what was the reason given by Mr. Andrews as to why the company wanted that much time in which to get this title from the Alliance Trust Company; what purpose or reason was assigned for it? A. I understood from Mr. Andrews that they expected to take transfers from Lucile Oliphint after she had reached majority to the property that they were restoring to her under the terms of this contract. Q. For what purpose? A. For what purpose? You mean to ask for what purpose were the transfers taken? To pay them for the money they were out, just simply putting them back like they were before they had made the contract, that was the purpose that the transfers were for. Q. Do you recall a conversation between Mr. Andrews and Mr. Taylor in which they requested that that provision be put in the contract or any conversation about whether that be put in the court or leave it out? A. I do not know about that, but I know that I was very bitterly opposed to the entire arrangement and refused to make this agreement because

I knew that they expected to take the property back from her as soon as she had reached her majority and I refused to enter into this agreement or have anything to do about it until we were passing or about to pass the last term of court at which we might get a trial before she became of age. It occurs to me that this was during the September term of court before she became of age and we could not keep them from carrying out their plans of settling except to make this agreement and making them restore the property within the time that the guardianship might still be pending over her and then leave it to her as to what she would do. Q. Did Mr. Andrews and Mr. Taylor disclose to you that that was their plans as soon as Lucile became of age to take the lands back from her? A. Mr. Taylor had no conversation with me; all the conversations were had with Mr. Andrews, and I understood the plans from Mr. Andrews. * * *

### Cross-Examination by Mr. Andrews:

"Q. You say you figured Lucile Oliphint would probably come of age prior to the next term of court if it passed the September term of court? A. That was as I now recall it the reason why we could not hold out any longer that she was about to become of age and you frequently told me that you had made settlement with the rest of them as soon as they became of age and that would be true as to Lucile. Q. You knew that you would have no authority to represent her as attorney for the guardian when she had become of age? A. Yes, sir.''

The testimony of Wayne H. Lasater, the other attorney for N D. Duffield, as guardian, is to the same effect as the testimony of A. F. Pyeatt. The testimony of N. D. Duffield shows that he did not even know of the purpose of the Western Indemnity Company to defraud his ward as soon as she should become of age. It is due to the guardian, Mr. Duffield, and his attorneys, Mr. Pyeatt and Mr. Lasater, to say that the record shows they were not in any way consenting to this fraud and conspiracy, but were doing all they could to protect the minor, who, during her minority, was dependent upon them for protection.

At the conclusion of the trial the court made the following findings of fact and conclusions of law:

### "Findings of Fact.

"1. That S. R. Oliphint was appointed by the county court of Garvin county, Okla., guardian of the plaintiff in this case, Lucile M. Oliphint, and certain others of his children. That during the time he was guardian he made a nominal sale of the minor's lands to E. G. Hightower, who mortgaged the land to the Alliance Trust Company, and that in 1913, the said S. R. Oliphint was removed as said guardian and

N. D. Duffield was appointed guardian of said minors; that in 1913 an information was filed against S. R. Oliphint charging him with embezzling certain funds that belonged to these minors; that said charge pended in the district court of Garvin county until the 17th day of January, 1916, at which time or on which date the said case was dismissed upon recommendation of the state.

"2. That L. C. Andrews was attorney for the said S. R. Oliphint during said guardianship sale and was his attorney in the criminal proceedings pending against the said S. R. Oliphint; that the land was sold under the mortgage held by the Alliance Trust Company and in July, 1915, at said sale the said Alliance Trust Company bought said land, and that thereafter in October, 1915, the defendant Western Indemnity Company made a contract with said Alliance Trust Company to purchase said land from said Alliance Trust Company.

"3. That on the 28th day of September, 1915, N. D. Duffield, as guardian of said plaintiff and the other minors, made and entered into an agreement in writing with the Western Indemnity Company by the terms of which agreement in consideration of the payment of the sum of five hundred dollars and the discharge of record of the liens and claims of the Alliance Trust Company and the Holmes & Hibbard Mortgage Company against the lands of said minors set out in the contract on or before the 20th day of January, 1916, said N. D. Duffield, guardian of said minors, agreed to release and relinquish all claims and actions and proceedings of every character against said defendant, Western Indemnity Company.

"4. The plaintiff, Lucile M. Oliphint, became of age on the 19th day of January, 1916, two days after the criminal case against S. R. Oliphint was dismissed.

"5. The court finds that L. C. Andrews before said case was dismissed on several occasions advised the said S. R. Oliphint that the criminal case pending against him in the district court at Pauls Valley. Okla., would not be prosecuted.

"6. The court finds that on the 28th day of September, 1915, when the said contract above referred to was made, that L. C. Andrews and W. M. Taylor. attorneys for the Western Indemnity Company, talked said agreement over with Alvin F. Pyeatt, attorney for said guardian. N. D. Duffield, and that at said time there was nothing in said contract attempted to be concealed from anybody interested in the same.

"7. That on the 26th day of January, 1916, L. C. Andrews and W. M. Taylor visited the home of S. R. Oliphint, in Norman. Okla. There was present said S. R. Oliphint, his wife, Jennie Oliphint, Jeanne Oliphint, Claude Oliphint and the plaintiff, Lucile M. Oliphint; that the said parties talked over the various transactions and that the said Lucile M. Oliphint at said time

made her quitclaim deed to the Western Indemnity Company, and that it was understood by the parties at the time that the said quitclaim deed was to be a mortgage securing the said Western Indemnity Company for the amount that they had paid to the Alliance Trust Company.

"8. The court finds that on none of these occasions did L. C. Andrews or W. M. Taylor represent to Lucile M. Oliphint, the plaintiff in this case, or any other member of the family that if they did not enter into said contract and execute said quitclaim deed that the criminal case against their father S. R. Oliphint, would be prosecuted, and he would be sent to the penitentiary.

"9. The court finds that the said instrument should be construed to be a mortgage and be due by the terms of the agreement made by the said Western Indemnity Company six years from January, 1916, at eight per cent. per annum.

"10. The court finds that the interest due on the mortgage to this date in the sum of ———— should be paid by the said plaintiff or said mortgage be foreclosed.

"11. The court finds that on the 26th day of January, 1916, at the time said quitclaim deed was executed, that the plaintiff, Lucile M. Oliphint, at said time knew of the contract made at Pauls Valley, by the guardian, N. D. Duffield, on the 28th day of September, 1915.

"12. The court finds the mortgage was executed to secure a note of $8,228.08, dated January 21, 1916, with 8 per cent. interest per annum, signed by S. R. Oliphint.

"Conclusions of Law.

"The court finds as a matter of law that no fraud, misrepresentations, or undue influence having been used by the said L. C. Andrews and W. M. Taylor in order to induce said plaintiff, Lucile M. Oliphint, to sign and execute said quitclaim deed, that the said deed is not void, but is in full force and effect as a mortgage, and that the same should be foreclosed under the law unless said plaintiff pays the interest due to date on the said mortgage."

The court's findings of fact Nos. 1, 2, 3, and 4 are within the issues and are sustained by the evidence. Finding of fact No. 5 is outside of the issues. It is immaterial that L. C. Andrews advised S. R. Oliphint that the criminal case would be dismissed. It clearly appears that Lucile M. Oliphint was not so advised. Finding of fact No. 6 is not a finding on the issue in the case. It finds there was nothing in said contract of September 28, 1915, attempted to be concealed from anybody interested in the same. The contract of September 28th was not in issue in this case. That contract was made long before the plaintiff in error became of age.

and she could not be bound by it. Furthermore, that contract made no provision for a reconveyance or mortgaging of the land of Lucile M. Oliphint. The court should have made a finding of what facts were actually revealed to Lucile M. Oliphint at the time she executed the deed in controversy.

In finding of fact No. 8 the court again missed the issue in finding that on none of these occasions did Andrews and Taylor represent to Lucile M. Oliphint that if she did not execute the deed the criminal charges would be prosecuted against her father. The record shows that Lucile M. Oliphint knew and understood the criminal charges were pending against her father and he would probably be sent to the penitentiary unless she consummated the deal by the execution of the deed. While it may not have been said to her in so many words, yet she fully understood this to be the situation, and Taylor and Andrews knew she so understood it, and took undue advantage of her, a girl of immature years, while she was laboring under a mental fear of the prosecution against her father. This amounted to extortion, as defined in sections 2682 and 2683, Revised Laws of Oklahoma, 1910. This question is thoroughly discussed in the very able opinion by Pitchford, J., in Pendleton v. Greever, 80 Okla. 35, 193 Pac. 885.

They had also impressed upon her mind that this was the only way she could protect her land and have any chance whatever of getting it back or relieving herself from total loss. As a matter of fact, the amount of the mortgage precluded her from ever redeeming it. Andrews well understood this, for he suggested that it might be better to just deed the land outright and then they would not be bothered about the debt.

Regardless of how artfully the Western Indemnity Company may have attempted to disguise the fact that it was in consideration of this settlement it was procuring a dismissal of the criminal prosecution against S. R. Oliphint, the fact remains that the prosecution was dismissed and it expected to save itself from any loss on account of his default by getting the property from his ward, for whose protection and benefit the bond was given. When her guardian defaulted the Western Indemnity Company stood in his place and assumed his responsibilities in protecting the estate of his ward. It could not discharge this duty by exploiting the ward's estate to protect its own liability. This may not be a new trick of surety companies, but, regardless of whether it is new or old, it is not a commendable one.

There was a fiduciary relationship existing between S. R. Oliphint and the plaintiff in error. The defendant in error knew of the existence of this fiduciary relationship, and it is not an innocent purchaser for value without notice. It would not be contended that this deed could be upheld if it had been made to S. R. Oliphint. Then how can it be upheld when it was made for his benefit to secure his pre-existing indebtedness when the one to be benefited by it had full knowledge of all the facts?

In Berkmeyer v. Kellerman, 32 Ohio St. 239, 30 Am. Rep. 577, the court said:

"A conveyance by a minor, on the day becomes of age, of all his real estate to a person occupying the relation of parent and guardian of such minor, in execution of a settlement made for such minor by others not authorized to bind him, and while he is still under his influence and control, and not advised of his rights, is not binding, and can only be upheld in a court of equity by clear proof that under all the circumstances it is just and equitable, and the burden is on the claimant to show the utmost good faith."

In Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756, in paragraphs 2 and 3 of the syllabus, it is said:

"2. Courts watch with great jealousy transactions of guardians with their wards or any dealings between them affecting the estate of the ward. From the confidential relations between them, it will be presumed that the ward was acting under the influence of the guardian, and all transactions between them prejudicially affecting the interests of the ward will be held to be constructively fraudulent. This presumption extends to transactions between them after the guardianship has ended, but where the influence remains, and the control and dominion over the former ward's property still continues.

"3. The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest sense suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained. The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continues. This influence is presumed to last while the guardian's functions are

to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. Any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit at the expense of the former ward made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption."

For other authorities supporting this principle. see: Balbridge v. Smith, 76 Okla. 36, 184 Pac. 153; Clinton v. Miller, 77 Okla. 173, 186 Pac. 932; Watts v. Jackson, 75 Okla. 123, 182 Pac. 508; Francis v. Sperry, 71 Oklahoma, 176 Pac. 732; Hays v. Feather, 244 Ill. 172; White v. Ross, 160 Ill. 72, 43 N. E. 336; Miller v. Simonds, 72 Mo. 687; Audenreid's Appeal, 89 Pa. St. 114, 33 Am. Rep. 731; Miskey's Appeal, 107 Pa. St. 611; Bradshaw v. Yates, 67 Mo. 221; Williams v. Williams, 63 Md. 371; Ashton v. Thompson, 32 Minn. 25; Spargur v. Hall, 62 Iowa, 498; Fitch v. Reiser, 79 Iowa, 34.

After a careful and thorough examination of the record, we are unable to find any consideration for this deed except the dismissal of the criminal prosecution against her father. The method employed by the Western Indemnity Company in procuring the deed amounted to extortion, duress, menace, fraud, and undue influence.

Section 984, Revised Laws of Oklahoma, 1910, in so far as applicable in this case provides:

"A party to a contract may rescind the same in the following cases only: First. If the consent of the party rescinding, or of any party jointly contracting with him was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by/ /or /with the connivance of the party as to whom he rescinds, or of any other, party to the contract jointly interested with such party. * * *"

In Re Spann, 51 Okla. 309, 152 Pac. 68, this court said in the syllabus:

"1. Whenever there exists between parties confidence on the one hand, and influence on the other, from whatever cause they may spring, equity requires in all dealings between them the highest degree of good faith on the part of him in whom the confidence is reposed. * * *

"3. He must be guilty of no fraud, falsehood, or deceit in obtaining such consent, and the burden of proof is upon him to show this, by a clear preponderance of the evidence, and in no other way can he be protected in deviating from the line of his fiduciary duty."

In Chisum v. Huggins, 55 Okla. 423, 154 Pac. 1146, this court said:

"A contract obtained by the fraudulent representations or conduct of one of the parties thereto should not be enforced, if it satisfactorily appears from the evidence that the party seeking a rescission has been misled in regard to a material matter by such misrepresentations or conduct to his injury; and it matters not that the party so misled may have been in some degree negligent, for it is not just or equitable for a person who has deceived another to challenge his credulity, or shield himself from the consequences of his own misconduct behind the faith and confidence reposed in him by his victim."

The defendant in error took an undue advantage of the plaintiff in error in procuring the execution of the deed. Lucile M. Oliphint was young, inexperienced, in mental fear of the criminal prosecution pending against her father. She was not advised that the criminal prosecution had been dismissed, or that the Western Indemnity Company was bound to protect her estate according to the terms of its bond. (On the contrary they represented to her that her only chance to get the land back was to sign the papers.) Even while she was a minor the defendant in error had conspired to cheat and defraud her out of her property the minute she became of age. Not being able to perpetrate this fraud through her guardian or his attorneys, it would not complete the settlement until she became of age. Taking advantage of her mental fear that her father would be criminally prosecuted, which fear it had previously created, it perpetrated the fraud upon her by procuring the deed without any consideration whatever.

This is an action invoking the equity jurisdiction of the court to cancel the deed. The methods used by the Western Indemnity Company in procuring this deed cannot appeal to the conscience of a chancellor. The law applied to the facts disclosed by this record leaves no alternative for a court of equity but to decree a cancellation of the deed.

In Marshall v. Grayson, 64 Okla. 45, 166 Pac. 86, the third paragraph of the syllabus reads:

"This being a purely equitable case, this court will consider the whole record. weigh the evidence. and where the judgment of the trial court is clearly against the weight

of the evidence, render, or cause to be rendered, such judgment as the trial court should have rendered."

The judgment of the trial court is reversed, with instructions to render judgment canceling the quitclaim deed and quieting the title of the plaintiff in error as against all the claims of the defendants in error.

PITCHFORD, V. C. J., and JOHNSON, McNEILL, and KENNAMER, JJ., concur.