## CHISUM v. HUGGINS *et al.*

No. 6067.   Opinion Filed January 11, 1916.
Rehearing Denied February 15, 1916.

(154 Pac. 1146.)

1. **CONTRACTS—Right to Enforce—Fraudulent Representations— Negligence of Victim.** A contract obtained by the fraudulent representations or conduct of one of the parties thereto should not be enforced, if it satisfactorily appears from the evidence that the party seeking a rescission has been misled in regard to a material matter by such misrepresentations or conduct to his injury; and it matters not that the party so misled may have been in some degree negligent, for it is not just, or equitable, for a person who has deceived another to challenge his credulity, or shield himself from the consequences of his own misconduct behind the faith and confidence reposed in him by his victim.

2. **VENDOR AND PURCHASER — Validity of Contract — False Representations.** The rule of caveat emptor is no longer a shield and protection to the deliberate frauds and cheats of the "blue sky sharper," and where a party positively makes false representations, as an inducement for another to contract with him, and such person, relying wholly upon such false representations, enters into a contract, such contract is voidable for fraud, even though the false representations were innocently made.

3.  **FRAUD—False Representations—Action for Deceit.** A statement by a vendor that he has been offered a certain sum for the property on sale, or that a third party has been offered a certain sum for the same kind of property in the same location, is a statement of a material fact affecting the value, and, if false, may form the basis of an action for deceit.

(Syllabus by Robberts, C.)

*Error from District Court, Pottawatomie County;*
*Charles B. Wilson, Jr., Judge.*

Action by W. C. Chisum against Ellen Huggins and another. Judgment for defendants, and plaintiff brings error. Affirmed.

*Paul F. Cooper*, for plaintiff in error.

*B. B. Blakeney* and *J. H. Maxey, Jr.*, for defendants in error.

Opinion by ROBBERTS, C. This action was commenced in the district court of Pottawatomie county on the 10th day of July, 1911, by W. C. Chisum against Ellen Huggins and T. W. Smith, to recover judgment upon a promissory note signed by said parties, and for foreclosure of mortgage on certain real estate in the city of Shawnee, executed by the defendant Huggins. The defendant Smith was surety on the note. The petition is the usual pleading for such proceeding. The parties herein will be designated "plaintiff" and "defendants," the same as below.

The defendants answered by general denial of all allegations of the petition not specifically admitted in their answer or cross-petition. They admit the execution and delivery of the note and mortgage sued on, but allege that defendant Huggins was principal and defendant Smith was surety on said note, which fact was at all times known to plaintiff. They also allege that said note

was given in part payment for the purchase of the real estate included in the mortgage, and that the plaintiff in person, and by his agents, Fay Chew and U. S. Hart, sold said real estate to. the defendant Huggins for the consideration of $550, on which the defendant at the time paid plaintiff the sum of $250 in cash, and gave the note and mortgage involved for the sum of $300; and defendants allege that they received no consideration for said note and mortgage, and that they are not indebted to plaintiff on account thereof, nor for any amount whatever, and that said contract for the sale and purchase of said property has been rescinded on the ground of fraud, misrepresentation, undue influence, and abuse of confidence on the part of plaintiff and his agents above mentioned, in the following particulars: That at the time of the execution of the said note and mortgage, and at the time of the sale and transfer of said property, the plaintiff, in person, and through his agents, Fay Chew and U. S. Hart, stated to the defendant Huggins that immediately north, and within one mile, of this property, there was located at that time, and would within six months be built and maintained, a large packing plant; and that adjoining said packing plant lots had been laid out. and would be sold to and occupied by persons who would be employed in the building and operation of said plant; and that in connection with said packing plant there had been located, and would be maintained, stockyards, which would accommodate a large number of cattle, and other stock, and the building and operation of said plant and cattle yards would greatly enhance the value of the property in that portion of the city. Defendant Huggins further alleges that she had had no experience in dealing in real property, which fact she told plaintiff and his agents,

and knew nothing about the probability of the increase in value of the property, and that she was unable from her own inexperience to ascertain the value thereof, and told the plaintiff and his agents that she desired them to state to her the true condition in regard thereto; that she would rely upon their judgment in the matter, and asked them to tell her the truth, and the value of the property; and that plaintiff and his agents told the defendant Huggins that they knew she did not know the value of the property, and that they would tell her the true condition in connection therewith, and that she could rely upon their statements in that regard. And said defendant states that, reposing special trust and confidence in the integrity and ability of the plaintiff and his agents, and knowing nothing of the value of the property, she relied upon their representations and believed the same to be true, and that, relying upon their representations, she made a contract to purchase said property, and that she would not have made the contract under any other circumstances. Said defendant further says that $550 was more than five times the actual value of the property, unless the packing plant and stockyards were to be built, and said contract was made upon the express understanding that said improvements would be made.

It is further alleged that plaintiff stated to defendant Huggins that he was the owner of other property adjoining this property, of the same size and location, and that he had been offered $1,200 for the same, and had refused to sell it; that the property he intended to sell to the defendant was the only property he had left in that section of the city, and he would sell it to her only for the reason that she was a special friend, and he wanted to give her a bargain; that the Development Company had, the day be-

fore, paid $40,000 cash for the Chas. Kirst place, and had refused $35,000 for 20 lots in the neighborhood of the property involved; that a wire and steel plant had been located in the immediate vicinity of this property, and an interurban railway had been located between Oklahoma City and Shawnee and would, within six months, be built and operated by said property; that, immediately across the street, H. T. Douglas had purchased property, and had agreed to build a handsome residence thereon within six months from that date; and defendant says that she believed such representations and relied thereon. Defendant further alleges that plaintiff, at the time of the purchase of said property, stated to her, as an inducement to purchase the same, that he could, and would, dispose of said property within 30 days for the sum of $1,200; that defendant believed the plaintiff would comply with his promise, and relied thereon; that said representations were false and fraudulent, and made by plaintiff without the intention of performing the same, but for the purpose of cheating and defrauding the defendant, and with no intention to carry the same out. And defendant alleges, in substance, that each and all of said representations of plaintiff as to said property, and the value thereof, and all other facts, conditions, and circumstances of and concerning said property and its surroundings, were false, and known by plaintiff and his agents to be false, and were made to defendant for the express purpose of inducing her to purchase said property at a price greatly in excess of its actual value, and to thereby cheat and defraud her. Defendant further says that upon ascertaining that the said representations were false, and the true facts in relation thereto, she immediately offered to and did rescind the said contract, and

offered to reconvey the property conveyed by the said plaintiff to her, and demanded that her note and mortgage be cancelled; but plaintiff refused to accept the same, and defendant now offers to rescind the said contract, and tenders into court a deed conveying the said property to the plaintiff and the amount of money necessary for the recording of said conveyance, and other expenses to the proper clearing of the title of said property, and asks that the said note and mortgage be canceled and ordered returned to her. Defendant alleges that, by reason of the said premises, the consideration for said note and mortgage has failed; that the said contract has been rescinded; and that she is entitled to have the same rescinded. Defendant prays that the plaintiff recover nothing, that the note and mortgage be canceled; the contract of sale rescinded, and defendant have judgment for costs.

For her cross-petition, defendant Huggins alleges: That relying upon the said representations aforesaid, and believing them to be true, and relying upon the said promises to resell the said property within 30 days from the date of sale for the sum of $1,200, and believing that said promises were made in good faith, and intended to be performed, this defendant paid to the plaintiff the sum of $250 on the 8th day of March, 1910. That said promises and representations were false, and made with the intention to defraud, cheat, and swindle this defendant, and known by the plaintiff to be false at the time; and that, immediately upon learning that the same were false, this defendant offered the plaintiff a deed to said property, and offered to reconvey the same to him, and demanded that said note and mortgage be canceled and a repayment to this defendant of the sum of $250; and that the said defendant stated to the said plaintiff herein

that she did thereby elect to rescind the said contract, and declare the same rescinded, and now tenders into court a deed reconveying said property and all expenses necessary to record the same and incident to the proper clearing of the title thereof. Defendant further alleges that by reason of the said promises she is entitled to a return of the sum of $250 and interest thereon at the rate of 6 per cent. per annum from the 8th day of March, 1910. And defendant prays judgment against plaintiff for the sum of $250, with interest, and for costs in this behalf expended.

A demurrer to defendant's answer and cross-petition was overruled, and plaintiff excepted.

Plaintiff replied as follows:    (1) A general denial. (2) Denied the allegations of fraud or false representations, or that plaintiff had any knowledge of such statements.    (3) Denied a rescission.    (4) Alleging that defendant examined the property; that no fiduciary relation existed between the parties; that the projected improvements were as open to defendant's investigation as to plaintiff.

The case was tried to a jury, and verdict returned for defendant for $250, upon which judgment was rendered, with a decree cancelling the mortgage. Plaintiff brings error.

Two questions are here presented for consideration: (a) Are the facts alleged in the answer and cross-petition sufficient to entitle the defendant to the relief prayed for therein?    (b) Does the evidence establish such a state or facts as entitle the defendant to the relief sought?

We confess that our first impression was that neither the allegations, nor the proof, were sufficient to sustain

the judgment, and, if we were to rely upon the earlier authorities, we would still be forced to that conclusion; but it seems that the later decisions are not as liberal or lenient as they formely were with the trader, in his "dealer's talk," "offhand matters of opinion," "representations as to values," and false statements as to "prices which have been offered or paid" for the property on sale or trade, and the rule of *caveat emptor* is no longer a cloak beneath which the intentional falsifier may retire to protect himself from the effects of his false and fraudulent transactions. This is probably due to the great increase in the number of cheats and frauds of the "blue sky" operators of these days.

For the purpose of considering the point now in hand, we have heretofore given the substance of the answer and cross-petition, and, in line with that, we quote a part of the testimony in support of these allegations:

Mrs. Huggins, speaking of the lots, testified as follows:

"A. Well, I told him as we came back, I said, 'Mr. Chew, if you don't know for certain that packing plant is to be built,' I says, 'I haven't got the money to pay just to hold them.' I told him, 'I haven't got the money to make the second payment.' He said, 'You needn't worry about that, I guarantee I will sell them inside of 30 days for $1,200.' Q. What did he say, if anything? A. He said the packing plant would be built, he knew it would be. Q. Now, Mrs. Huggins, state to the jury whether or not Mr. Chew pointed out to you where the packing plant was to be built? A. Yes, sir; he pointed out it would be three-quarters of a mile, or probably further, and we asked him where it was to be, and he said, 'Over on the hill there, about a mile and half or two miles from town,' and he said it was to be built over there on the hill. * * * A. Well, I asked him if he knew

for certain the plant, the packing plant, was to be built, and he said he did, and I said if he didn't know for certain I didn't want to buy, I didn't have the money to make any second payment, and he said he certainly knew what he was talking about, it would be built. I relied on him and supposed he represented an honest firm. Q. Mrs. Huggins, what did you tell him, if anything, in regard to your relying upon his representations and taking his statement as true? A. I told him I would depend on what he said to be true. I wouldn't buy on that consideration unless I understood he knew what he was talking about, and that was the only reason I was buying, it was on the strength of his saying the plant would be built. Q. Now, did you repose confidence in these statements that he made to you? A. Yes, sir. Q. Would you have bought this property if he hadn't made these statements to you? A. No, sir. Q. After he made these statements, did you make any further inquiry? A. No, sir; I did not. Q. Why didn't you? A. I thought he had told me the truth, and I didn't think it necessary. I said I took what he said to be true, and if I took the lots it would be on the strength of what he told me—the plant would be built. Q. You say after he told you that you didn't make any further inquiries? A. No, I didn't make any further inquiries. Q. Why didn't you make any further inquiries? A. I thought he knew. Q. Well, did you rely upon him? A. Yes, sir. * * * Q. And believed them to be true? A. Yes, sir. Q. And would you have made the deal or contract if he hadn't have made these representations he made to you? A. I would not. Q. Did you repose special confidence and trust in his statements? A. Yes, sir. Q. I believe you stated at the time you had no knowledge of the value of the property. A. No, sir. Q. Had you ever bought property of that nature before? A. No, sir. Q. And had no experience in dealing with real estate at all? A. No, sir."

She also testified that the plaintiff's agent represented to her that a wire and steel mill would be located

in that neighborhood, and that Mr. Kirst had been paid $40,000 for his property, and also as to other improvements which is alleged in the petition. It appears that she did not want to take the property, and called up Mr. Chew and told him so, but that he told her she had already taken it, and that she could not back out. She testified as to this as follows:

"A. I told him I would 'phone to him the next day whether I would take them or not. I said, while he told me the plant was to be built, I didn't know whether I would have money to make the first payment, I would 'phone to him and let him know the next day whether I would take them or not, and the next morning about 10 o'clock I told him I wouldn't take the lots, and he said, 'It is too late, Mrs. Huggins, the papers are made out,' and I said, 'I don't want to take them at all,' and he said, 'It is too late, I have already made the papers out,' and a little later they came up, and I said, 'Why did you come, I told you I wouldn't take them?' Q. What did they have, if anything? A. They had the papers with them, the contract, deed, and notes to be signed. Q. Did they have that note that is offered in evidence here? A. Yes, sir. Q. And did they have this mortgage that is offered in evidence? A. Yes, sir. Q. I will ask you to state to the court and jury whether or not the note and mortgage was made out? A. It was. * * * Q. Did you know the firm of Lambard & Hart? A. Yes, sir. Q. How long had you known them? A. Really, I don't know how long I had known them, about a year. I had known of them ever since they had been there, but I don't know how long. Q. How long had you known of them? A. Probably a year. I heard of them ever since they had been in town. Their reputations were good so far as I knew of. I supposed they were honest men and would tell what was true."

Miss Huggins, a witness on the part of defendant, testified:

"A. He told her the packing plant, a very large packing plant, would be built in that neighborhood. Q. Did he point out where the packing plant would be built? A. Yes, sir. Q. What did Mr. Chew say to your mother in your presence about the packing plant? A. She told him—she asked him if he knew positively that the packing plant would be built. She knew in his business he would know the truth about it, and she wanted to know the truth about it. Q. What did he say? A. He told her it would positively be built; he knew and understood all the things and knew it would be built. Q. What was said, if anything, in regard to the arrangements, or what he knew of the arrangements, that had been made with the Development Company? A. He said he knew all the papers had been signed up and everything would be carried out, and it would be built within six months. Q. Now, do you remember any further discussion about the packing plant there than you have detailed? A. She told him that—well, she wanted to know the truth about it, that she placed all of her confidence in him for the truth of the matter. Q. Well, give the language in regard to the packing plant as near as you remember it. A. She asked him—I can't give the language. He told her it would be built within six months; he knew it to be a positive fact; all the papers had been signed up with the Development Company and it would be built. She told him all her confidence was placed in him. * * * He told her a steel and wire factory would be built in that neighborhood. Q. Did he say whereabouts? A. He didn't tell the exact location, but from his conversation we supposed it would be built out there. Q. In the neighborhood of the lots? A. In the neighborhood of the lots and packing plant. Q. Was there any other statements made about improvements or purchases that had been made, if you remember? A. He told of several lots that had been bought and residences to be built, one of H. T. Douglas' residence to be in the neighborhood. Q. Where was H. T. Douglas' residence? A. Just across the street. Q. In the immediate neighborhood of the property? A. Yes,

sir; just across the street. Q. Did he say anything about any sales having been made? A. He said the Kirst place had been sold, the Development Company had bought that for $45,000, and lots were being sold all around. Q. Where was the Kirst place? A. It was to the east, nearer town. Q. Now, Miss Huggins, you remember anything about any statements made there about the Development Company having bought property in that neighborhood? A. Yes, sir; the Development Company bought the Kirst place. Q. Any other property? A. They bought up several lots and paid $35,000. Q. You say they paid $35,-000. You know where those lots were? A. It was about a block west and several blocks down south. Q. From where your mother was about to buy? A. From where we bought. Q. Now, what did your mother say after Mr. Chew made those statements to her about what she wanted to do about the property? A. Well, it was getting late, and we asked to be taken home, and on the road home she told him she would let him know in the morning; she didn't know at the time whether they would take them or not, and would let him know in the morning whether she would take them or not. Q. You know what experience your mother had had in buying or selling real estate? A. She had none whatever. Q. You lived at home with your mother up to that time, had you? A. Yes, sir. Q. All of your life? A. Yes, sir. Q. How old were you, Miss Huggins, at that time? A. About 19. I was 19. Q. You was about 19 years old? A. Yes, sir. Q. And you say your mother at that time had not had any experience in dealing in real estate? A. No, sir. Q. Now, you know whether she so stated to Mr. Chew? A. She told him she had had no business affairs at all and she depended on him altogether. Q. At that time did you know what business Mr. Chew was engaged in, or what he had been engaged in? A. Yes, sir; I knew he was with Lambard & Hart in the real estate business."

Charles Kirst also testified that the Development Company had not paid him $40,000 for his property; that

they offered to buy his place for $36,000 on long-time payments, and he would not accept it, and no *bona fide* sale had ever been made. He also testified that none of these improvements had been made. A wire and steel plant had been built in the other side of the city, about a mile and a half from this property, and on the other side of the business district of the city; but none of the improvements talked of had been made.

W. F. Huggins testified that he had given to Mr. Chisum, plaintiff in the case, an offer to rescind his contract, and that Chisum refused, and that he did not tender him formally a deed for the reason that he thought it would be useless, inasmuch as Mr. Chisum had told him that he would not accept it.

"Q. At that time you told him you would deed it back to him? A. Yes, sir. Q. And he told you he didn't —wouldn't accept it? A. Yes, sir. Q. And after he told you he wouldn't accept it, you didn't think it was necessary to make out a formal deed? A. No, sir."

J. H. Maxey testified that the lots were, at the time, of the reasonable value of $2 a foot, or the entire tract purchased would be of the value of $100.

W. C. Chisum, the plaintiff, testified that he sold this property to Mrs. Huggins for $11 a foot.

"Q. Now, how much per foot did you get for the property you sold to Mrs. Huggins? A. Eleven dollars."

Mr. Chew, the agent of plaintiff, testified:

"Q. What representation did she make to you with reference to her resposing special confidence in you, with reference to your advice to her as to purchasing this property? A. Mrs. Huggins, to the best of my recollection, made some remark to Mr. Lambard and myself as to the

confidence she had in us as real estate men generally, and said she was depending upon us to sell the property for a profit; that she was not buying it to hold, but to sell. * * * In my opinion, the packing house and other developments were discussed, and I am of the opinion that Mrs. Huggins was told that the property was worth the money whether the packing plant was built or not. Q. Who told her so? A. I probably stated it myself. Q. You told her this while you were acting as agent for Lambard & Hart and while you were trying to make a sale of this property? A. Yes, sir. Q. Your main object was to sell real estate to whomever you could and get your pay for it for whatever price you could get? A. That was my business at the time."

The plaintiff, Chisum, testified that he listed his property with Lambard & Hart for sale, and that they represented him in making the sale; that he personally took no part in the matter and knew nothing about it, but that he accepted the proceeds of the sale.

At the close of the defendant's testimony, she tendered to the plaintiff a deed reconveying the property to him, and also return of the abstract delivered by the plaintiff to the defendant, and offered to pay all expenses of recording said papers and bringing such abstract down to date, and to pay all other expenses that the court might find it necessary to put the parties in *status quo*, and deposited said deed and abstract with the court to carry out the tender made in the defendant's answer and cross-petition.

The plaintiff testified, in substance, that the agents making the sale represented him, but he personally took no part in the transaction, except to make the conveyance and accept the proceeds of the sale. At the close of the testimony, the defendant tendered to plaintiff a deed to

the lots, and also a return of the abstract, with charges
for recording the deed and completing abstract to date,
which deed and abstract were deposited with the clerk
of the court; and tendered all other things necessary to
do complete equity between the parties.

The question of the truth or falsity of the statements
and representations of the agent in making the sale was
passed upon by the jury by their verdict against the
plaintiff.   The verdict was approved and adopted by the
trial court, and upon a careful consideration of the entire
record, we fully approve the findings of facts in that par-
ticular.

The more serious question is:   Are these facts suf-
ficient in law to sustain the judgment?   Plaintiff in error
relies upon the oft-quoted and many-times perverted
proposition that "trade talk," "false statements as to
value," "prices offered and rejected," "general glowing
and roseate environments," prospects of improvements,
increase in values, and all such matters so common with,
and useful to the "blue sky shark," to be fraudulent in
law, must relate to a present or past state of facts, and
that relief cannot be obtained by a victim for a failure
of such false representations and promises to materialize,
and especially for failure of third parties to make im-
provements which the vendor, as an inducement to the
sale, said would be made; and also that, in matters of
opinion, if the vendor makes representations as of his
personal knowledge, if he in fact believes them to be
true, and they are not made with the intention to de-
ceive, it does not amount to a fraud, although the state-
ments in fact were false.   The trouble with plaintiff's
contention in this behalf is that his premises stated do

not quite come up to the facts relied on herein by the defendant. In this cause the plaintiff testified, speaking of the lots, that the agent said: "You needn't worry about it. I guarantee I will sell them inside of 30 days for $1,200," and "He said the packing plant will be built; I know it will be." She also testified:

"Well, I asked him if he knew for certain the plant, the packing plant, was to be built, and he said he did, and I said if he didn't know for certain I don't want to buy, I didn't have the money to make any second payment, and he said he certainly knew what he was talking about, it would be built. I relied on him and supposed he represented an honest firm. * * * I told him I would depend on what he said to be true. I wouldn't buy on that consideration unless I understood he knew what he was talking about. That was the only reason I was buying. It was on the strength of his saying the plant would be built. * * * I said I took what he said to be true, and if I took the lots it would be on the strength of what he told me—the plant would be built."

Miss Huggins testified, speaking of the same matters:

"Q. What did Mr. Chew say to your mother in your presence about the packing plant? A. She told him—she asked him if he knew positively that the packing plant would be built. She knew in his business he would know the truth about it, and she wanted to know the truth about it. He said he knew all the papers had been signed up and everything would be carried out, and it would be built within six months. She told him that—well, she wanted to know the truth about it, that she placed all of her confidence in him for the truth of the matter."

The testimony shows that the same positive statements of fact, and assurance of personal knowledge, were made by the agent in reference to the value, and sale and

purchase, of other property in the neighborhood of these lots at exorbitant prices; all of which were false, and either known by the agent to be false, or else made with absolute indifference as to whether they were false or not. Nor were they statements of a future, speculative nature. They were positive statements of material existent facts.

In the case of *Prescott et al. v. Brown,* 30 Okla. 428-432, 120 Pac. 991, 992, the same questions were involved, and a long line of authorities collated by Robertson, C., in which case he rendered a well-considered and able opinion, which, to our mind, fully sustains the contentions of defendant herein, as follows:

"As will be seen, the objections challenge the sufficiency of defendant's amended answer, all raising the same question, and we will consider them together. The part of the amended answer which plaintiffs in error contend does not state any defense is found in the third paragraph of second defense, and relates to representations, statements, and matters of opinion of Thorpe and White, and, as arranged by counsel for plaintiffs in error, may be stated as follows: First, 'matter of opinion'; second, 'dealer's talk'; third, 'representation as to value'; fourth, 'statements of price which he has given or been offered for it.'

"Counsel for plaintiffs in error contend, and want this court to uphold them in this contention, that the allegations of the defendant's amended answer, all of which for the purpose of the demurrer and other motions are taken as true, are simply expressions of opinion, dealers' talk, representations as to value, etc., which, even though they be false and were known to be false by Thorpe and White when made, and were made for the sole and express purpose of selling the patent right, and made to deceive and did deceive, the defendant, yet should be assumed by the court to be made always by persons holding property for sale, and that any purchaser who confides

in such statements should be considered by the court too careless of his own interests to be entitled to any relief, and that therefore said amended answer is insufficient in law, and that the court below erred in refusing plaintiffs in error the relief sought by the demurrer, etc. Such doctrine may be the law in some states, and possibly obtains to some degree in this state; but the trend of modern decisions is that where a contract is induced by false representations as to material existent facts, which are made with the intent to deceive, and upon which plaintiff relied, and was thereby deceived, it is no defense to an action for rescission, or for damages arising out of deceit, or to avoid a contract, that the party to whom the representations were made might with diligence have discovered their falsity, and that he made no searching inquiry into facts.

"In 20 Cyc. 53, it is said: 'General assertions or expressions of a vendor in commendation of his land or wares—commonly called "dealer's talk"—are generally held to fall within the rule under discussion, and thus to constitute no grounds for an action of deceit. Statements merely descriptive of the operation and utility of an invention or patented article are generally regarded as mere expressions of opinion, or "dealer's talk," upon which a purchaser cannot safely rely; and even a misrepresentation that experiments have been made with the invention and have proved successful has been held to be merely an expression of opinion and so not actionable, although put in the form of a statement of a past fact.' But, as is suggested by counsel for the defendant, the balance of that text reads as follows: 'But the decisions in cases of this character are not wholly consistent, and representations very similar to those just indicated have been held to be sufficient to ground an action for deceit as false statements of fact.' * * *

"In *Pierce v. Wilson*, 34 Ala. 596, it is said: 'But a gross misrepresentation of the capacity of a machine and the success in selling and operating it, of which the

purchaser was ignorant, has been held sufficient to warrant the rescission of the contract induced thereby.'

"On page 32 of 20 Cyc., we find the following: 'It is difficult to draw a line beyond which human credulity cannot go, especially in speculations in mining stocks. If the representations were so extravagant that sensible, cautious people would not have believed them, that is a proper consideration for the jury in determining whether the plaintiff believed and relied upon them; but it does not preclude a finding that the plaintiff did so, or relieve the defendant from liability for his fraud, if he committed fraud. It is as much an actionable fraud willfully to deceive a credulous person with an improbable falsehood as it is to deceive a cautious and sagacious person with a plausible one. The law draws no line between the two falsehoods. It only asks in either case, was the lie spoken with intent to deceive and defraud, and was the false statement believed, and money paid on the faith that it was true? These questions are for the jury.'

"The statement as made by Thorpe and White that Ferguson, a man well known to the defendant and in whose business ability she had great confidence, was in Kansas City at that time organizing a corporation for the purchase of all the territory in the United States for $35,000 or $40,000, was certainly a statement of a material existent fact, and not an expression of an opinion or representation as to value. 'Statements by a vendor that a third person has offered him a certain sum for the property is a statement of a material fact affecting the value and may form the basis for an action of deceit.' 20 Cyc. 59. 'In cases where positive fraudulent misrepresentations have been made by the vendor, the modern cases show a strong tendency either to relax the doctrine of *caveat emptor,* or to refuse to extend it further than it has been carried by previous decisions, even with respect to "dealer's talk"; the courts taking the view that a vendor, guilty of a falsehood made with intent to deceive, should not be heard to say that the purchaser ought not

to have believed him.' 20 Cyc. 62, and the long line of authorities there cited. 'A contract obtained by the fraudulent representations or conduct of one of the parties thereto cannot be enforced if it satisfactorily appears that the party seeking a rescission has been misled in regard to a material matter by such representation or conduct to his injury.' *Coolidge v. Goddard*, 77 Me. 578, 1 Atl. 831; *Schneider v. Foote* (C. C.) 27 Fed. 581; *Seeley v. Reed* (C. C.) 25 Fed. 361; *Mills v. Collins*, 67 Iowa, 164, 25 N. W. 109. 'Where a person positively makes false representations as an inducement for another to contract with him, and such person, relying wholly upon such false representations, enters into a written contract, the contract is voidable for fraud, although the false representations were innocently made.' 28 Kan. 517, *Wickham v. Grant.* * * *

"In Bigelow on Frauds, p. 524, is found the following: 'If the representations were of a character to induce action, and did induce it, that is enough. It matters not, it has well been declared, that a person misled may be said, in some loose sense, to have been negligent (in reality, negligence is beside the case where the misrepresentation was calculated to mislead, and did mislead); for it is not just that a man who has deceived another should be permitted to say to him, "You ought not to have believed or trusted me," or "You were yourself guilty of negligence." This indeed appears to be true even of cases in which the injured party had in fact made a partial examination.' And in *Strand v. Griffith*, 97 Fed. 854, 38 C. C. A. 444, it is said: 'The rule of *caveat emptor* is not founded on a high standard of morals, but it is no longer a shield and protection to the deliberate frauds and cheats of sharpers.'

"These authorities amply sustain the rule contended for by defendant in error that where a party was induced to make and enter into a contract by the false and fraudulent representations of material existent facts, which were made for the purpose of deceiving the party, the

contract may be avoided, and this doctrine has also been enunciated by decisions of our own Supreme Court, especially in the case of *Gilpin v. Netograph Machine Co. et al.*, 25 Okla. 408, 108 Pac. 382, 29 L. R. A.. (N. S.) 477. * * *

"Bigelow on Frauds, vol. 1, page 523, lays down the rule as follows: 'Recent authority has, however, gone far towards setting the matter right in principle. The propoistion has now become widely accepted, at law as well as in equity, at least as general doctrine, that a man may act upon a positive representation of fact, notwithstanding the fact that the means of knowledge was specially open to him, although he had legal notice of the real state of things. It may be improbable that a man with the truth in reach should accept a representation made in regard to it, but the improbability can be no more than a matter of fact.'

"In *Fargo Gas & Coke Co. v. Fargo Gas & Elect. Co.*, 4 N. D. 219, 59 N. W. 1066, 37 L. R. A. 593, a well-considered case involving a discussion of this identical question, the court in closing said: 'The unmistakable drift is toward the just doctrine that the wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of his victim. The general rule is, and upon principle must be, that the question is one of reliance by the buyer upon the false statement of the seller. Whether it was wise for him to rely upon it, whether he was prudent in so doing, whether he is not chargeable with negligence in a certain sense in not investigating these inquiries, are in general immaterial, provided the purchaser has in fact been deceived. The circumstances under which fraud is accomplished are so varied, the nature of the property and the character of the misrepresentations so widely different, in different cases, that it is unwise to attempt to enunciate with precision a general rule by which all cases shall be governed.' "

These authorities, *supra,* seem peculiarly applicable to the facts disclosed here, and as settled by the verdict of the jury, the effect of which is that the representations of the agents of plaintiff, as to the future prospects, present conditions, actual value, and general environments of the lots, were false,. and known by them, at the time, to be false, and made for the express purpose of inducing the defendant to purchase the property at a price far in excess of its actual value, and with the intention to cheat and defraud her.

Several other questions are presented and argued in the briefs of counsel; but, as we view the case, a discussion of other matters is unnecessary. We will say, however, that we have considered the entire record, and are of opinion that no error, prejudicial to the rights of the plaintiff, was committed by the trial court. The evidence reasonably tends to support the verdict of the jury, and the judgment should be affirmed.

By the Court: It is so ordered.