Larry W. BEAVERS, Appellant,

v.

LAMPLIGHTERS REALTY, INC.,
Appellee.

No. 48700.

Court of Appeals of Oklahoma,
Division 2.

Sept. 21, 1976.

Rehearing Denied Oct. 14, 1976.

Certiorari Denied Nov. 22, 1976.

Released for Publication by Order of Court of Appeals Dec. 2, 1976.

Charles G. Humble, Bethany, for appellant.

William C. Meadows, Todd Markum, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

Plaintiff, the prospective purchaser of an Oklahoma City home, was warned by the realty salesman that "If you are going to do anything, you had better do it pretty quick, because I've got a buyer for it . . the original builder and he is coming in . . . with a check . . . within the hour." This, alleges plaintiff, was a lie which induced him to agree to pay more for the house than he otherwise would have had to had he known the truth.

These facts defendant Lamplighters Realty, Inc.[1] admitted to be true for the purpose of demurring to plaintiff Beavers' evidence—a plea sustained by the trial judge followed by the rendition of judgment for defendant. From an order rejecting plaintiff's motion for a new trial he appeals assigning one reversible error—that defendant's demurrer to his evidence should have been overruled. We agree it should have been and reverse.

I

It was sometime in January 1974 plaintiff saw a Lamplighters' for sale sign in front of an attractive Spanish style house at 4912 Larissa Lane. He liked the storybook looks of the abode, called the telephone number printed on the sign, and eventually was shown the house by agent Norma Ray. Shortly thereafter, on Febru-

---

1. The purchase contract form is captioned with the name "Jim Taylor's Lamplighters, Inc., Realtors."

ary 11, 1974, plaintiff's offer of $34,500 for the dwelling was rejected.

Plaintiff still wanted the place, however. He let a day or two pass and again called Lamplighters. This time a "Mr Taylor came on the phone" and asked if plaintiff was still interested in the home. "Yes," said plaintiff, "but doggone it . . . they were asking too much."

"If you are going to do anything, you had better do it pretty quick, because I've got a buyer for it," said the realtor.

"You do?" responded plaintiff.

"Yes," said Taylor, "it [is] the original builder and he is coming in."

"Paul Good?" asked plaintiff.

"Yes," answered Taylor, adding that Good was coming in with a check right away.

"How much is it?" plaintiff asked concerning the check.

"Thirty-seven thousand dollars" was the answer.

"Well, he's bought it."

"No," retreated Taylor, "[i]f you want to put in a bid, he's going to be here within the hour. I just talked to him."

The high pressure tactic worked. Said plaintiff, "I [don't] know whether 'panicked' [is] the [right] word or not, but I figured . . . that [if] the original builder would pay thirty-seven thousand for the home, that maybe . . . it absolutely should be worth that much to me . . . and I just increased it [the fictitious offer] two hundred and fifty dollars. And the next thing I know I bought myself a home" for $37,250 by executing a contract dated February 15, 1974.

It was a while before plaintiff found out he had been a victim of a gross deception. One day, after he had moved into the house—and found, incidentally, that the agent Ray had made false representations about the condition of the house, requiring him to expend about $6,000 for repairs— he chanced to meet builder Paul Good at a neighbor's home, got to talking to him about plaintiff's house and came upon some interesting facts. Good said he had earlier looked at the house "but it was out of the ball park as far as he was concerned" and that he "would have given in the . . . lower thirties."

"Well," said plaintiff, "I'd offered thirty-four five to start."

"That should have bought it," said Good.

"Didn't you offer thirty-seven thousand?" plaintiff asked Good.

"No," he answered.

Upon discovering this, plaintiff took the matter up with his lawyer and instituted this action seeking compensatory damages for his detriment in the amount of $2,750 and punitive damages of $50,000.

Besides plaintiff's own testimony there was that of builder Good, who confirmed that he and his wife had looked at the house while it was on the market. Good said he found the dwelling to be in bad shape needing around $9,000 in repairs and had discussed the possibility of purchasing the property with agent Ray for $35,000, but he never made a formal offer to purchase it. Good testified he never discussed the house with Jim Taylor, though he had told Norma Ray he thought $37,000 "was a little high due to the fact there was so much work to be done on the house."

Following this evidence, plaintiff rested. There followed an unrecorded hearing at the bench and then this statement by the court: "Well, apparently, Mr. Burden [evidently a juror] isn't back yet. But in view of the defendant's demurrer to the evidence in this case I don't think we need to wait any longer on Mr. Burden, because the court has sustained a demurrer to the evidence in this case, which was interposed by Mr. Meadows at the conclusion of the plaintiff's case." Neither the journal entry of judgment nor anything else in the record gives a clue as to why the demurrer was sustained except that during the trial the judge seemed to be pushing the lawyers along for an early completion.

## II

Plaintiff argues, with merit, that he proved all essential elements of fraud, namely, that Taylor made representations of material facts he knew were false to induce plaintiff to alter his position, which plaintiff damagingly did. Defendant on the other hand proposes that (1) the representations complained of are not actionable because they "are so commonly made by those having property to sell in order to enhance its value . . . ." and (2) plaintiff has proved no resulting "damages."

█ The first contention was quite forcefully destroyed over a half century ago by a high-minded court in *Chisum v. Huggins*, 55 Okl. 423, 154 P. 1146 (1916). There, recovery on a note was denied because it was the fruit of a real estate sale induced by fraud of seller's agents in making false statements as to the "future prospects" of the land, its "actual value, and general environments . . . ." While *Chisum* is factually distinguishable, its importance to us here is that the court premised its decision on the rationale of the yet earlier case of *Prescott v. Brown*, 30 Okl. 428, 120 P. 991 (1911), which featured a remarkably lucid, no-nonsense opinion executing a powerful assault on one of the less admirable hand-me-downs of our Anglo-Saxon common law heritage —the doctrine of caveat emptor, a doctrine that exalts deceit, condemns fair dealing, and scorns the credulous.

The time had come, observed the *Prescott* author, for the court to recognize that the rule of caveat emptor is not founded on a high standard of morality and to outlaw use of this ally of dishonesty as a shield to protect gains of the "blue sky shark" achieved by his deliberate frauds and cheats.

Specifically pertinent to the facts of the case at bar is *Chisum's* promulgation of the rule that "[s]tatements by a vendor that a third person has offered him a certain sum for the property is a statement of a material fact affecting the value and may form the basis for an action of deceit." Such a statement, explained the court, is more than mere puffing or so-called "trade talk." It is a motivational fact-related lie.

█ A prospective buyer has a right to rely on the veracity of the seller (or his agent) without investigation. The risk of harm in this state lies with the wrongdoer rather than his victim. And as noted in *Prescott*, this right of reliance must be protected even if the representations be "so extravagant that sensible, cautious people would not have believed them . . . .. It is as much an actionable fraud willfully to deceive a credulous person with an improbable falsehood as it is to deceive a cautious and sagacious person with a plausible one. The law draws no line between the two falsehoods. It only asks . . . Was the lie spoken with intent to deceive and defraud, and was the false statement believed, and money paid on this faith that it was true? These questions are for the jury."

█ In the instant case the evidence so far adduced establishes that realtor Taylor, upon becoming aware of plaintiff's desire for the Spanish villa, undertook to bring about a rather rapid resolution of the price problem by using, as it were, a dynamite sales technique to blast an immediate positive response out of plaintiff. The deliberate lie did indeed achieve the intended and expected effect and induced plaintiff to purchase the property for a figure higher than he would have had to pay absent the fraud.

## III

Defendant's second proposition—that plaintiff proved no damage as a result of the falsehood—is likewise without merit. Its theory is that in electing to affirm the contract and seek damages, plaintiff's recovery is limited to "the difference between the actual value of the property at the time it was purchased and *the value it was represented to be*," and here, there

**1332**

was no proof to show the actual value of the house at the time of purchase.

This notion of the applicable law is not quite right. The measure suggested by defendant is based on dictum it offers from the *A. A. Murphy, Inc. v. Banfield*, Okl., 363 P.2d 942 (1961), wherein the criterion was said to be "the difference between the actual value of the property as delivered and the value it would have had if it had been as represented." This gauge however, is not applicable here because, as we will explain shortly, the detriment imposed upon plaintiff by the deception [2] did not involve a misrepresentation of *value* as such, but a *price* related canard.

The value rule, originally a principle of personal property law, was first employed in a fraudulent real estate exchange case shortly after statehood. *Howe v. Martin*, 23 Okl. 561, 102 P. 128 (1909). It was used because the court concluded it would best compensatorily satisfy detriment caused by the fraudulent representation of land value—compensation sanctioned by 23 O.S.1971 § 61[3] for non-contractual breaches of duty in general, and 76 O.S.1971 § 2[4] for fraud and deceit in particular. But in cases where a discrepancy of land value was not involved judicial recognition has been given other criteria to determine detriment. For example, there is the case of *Stevens v. Reilly*, 56 Okl. 455, 156 P. 157 (1916), involving a factual situation comparable to the one we have here. In *Stevens,* a couple of real estate agents induced plaintiff to pay $9,600 (less $100 the agents said they would deduct from their commission) for a tract of land by falsely representing that to be the minimum

amount the owner would take for the land when as a matter of fact the owner had placed a minimum price of $8,500 on the property when he listed it with the agents. In furtherance of their scheme to cheat, the agents contracted with the owner under the pretense of buying the land from him so that they could convey the land to plaintiff as though they themselves were the owners—an artifice aimed at covering up their chicanery. The damage sought by plaintiff did not arise from a deficit in value, but the difference between the price asked by the owner and that paid by plaintiff—about $1,100. In these circumstances the court applied this rule: "Where the purchaser of property from a broker was induced to pay more than the owner asked for the property by the fraudulent representation of the broker that the owner would not accept less than the price paid, the purchaser is entitled, in an action for deceit, to recover of the broker the excess, which he pocketed, less the usual commission for making the sale."

Even in a value type situation, the victim of a real estate agent's dissimulation was permitted to recover as detriment, not only the amount of her lost bargain, but also "the reasonable cost of storing [some] equipment up to the time of the filing of the petition . . . ." *Calhoun v. Fisher*, 202 Okl. 542, 215 P.2d 846 (1949).

Finally, the point we make is underscored by the language of *Werline v. Aldred,* 57 Okl. 391, 157 P. 305 (1916)— another exchange of land case and one cited by defendant—in explaining exactly why it was applying the difference in value rule, viz., that the fraud was perpetrat-

2. At least the deception relating to the Good offer. There was also evidence of false representations regarding the condition of the house which could bring into play either the "value" rule mentioned in *Banfield*, or the "cost of repairs" approach sometimes used to achieve a just result. See e. g., *Pace v. Parrish,* 122 Utah 141, 247 P.2d 273 (1952).

3. 23 O.S.1971 § 61 reads: "For the breach of an obligation not arising from contract,

the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not."

4. 76 O.S.1971 § 2 reads: "One who wilfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

ed through a bogus representation "as to value" of the land conveyed to plaintiff.

As we mentioned earlier, the representations here did not go to the issue of value, but to the issue of price—to the question of whether plaintiff was tricked into paying more for the property than he would have otherwise had to. To recover, therefore, plaintiff need not show what the value was of the dwelling he bought. He need only produce evidence from which the jury can find that he probably could have bought the house for less than the $37,250 he paid. As the record now stands, demurrants admit that the seller would have taken $37,000—a fact inferable from defendant's fabricated representation about the imminent Good sale. Assuming, without saying one way or the other, that no other detriment has been shown, evidence there is of at least $250 actual damage—enough to perfect plaintiff's cause of action for an intentional and malicious fraud, and enough to provide a foundation for an award of punitive damages. Moreover, having shown he sustained some detriment as a result of the fraud, plaintiff's action does not fail merely because he cannot prove an exact amount of damages. *Oklahoma City v. Eylar,* 177 Okl. 616, 61 P.2d 649 (1936); *Franklin v. Shure,* 110 Okl. 240, 237 P. 461 (1925); *Woods v. Ft. Smith & W. Ry.,* 96 Okl. 1, 219 P. 650 (1923). In such a situation, plaintiff is entitled to at least nominal damage. 23 O.S. 1971 § 98. And a nominal damage award is likewise sufficient to support punitive damages. *Moyer v. Cordell,* 204 Okl. 255, 228 P.2d 645 (1951).

The judgment below is reversed and the cause is remanded for a new trial.

BACON, P. J., and NEPTUNE, J., concur.